**Raul F. RODRIGUEZ, et al., Plaintiffs,**

v.

**BANCO CENTRAL, et al., Defendants.**

No. Civ. 82–1835 (JAF).

United States District Court,
D. Puerto Rico.

Oct. 10, 1991.

---

Francisco López–Romo, Harry Woods, Woods & Woods, San Juan, P.R., for plaintiffs.

Luis Sánchez–Betances, Sanchez–Betances & Sifre, San Juan, P.R., for Banco Cent.

James McLoughlin IV, Ricardo Rodríguez–Padilla, San Juan, P.R., for Carlo Bros.

## OPINION AND ORDER

FUSTE, District Judge.

After eight years of litigation and a seven-week jury trial, the court now faces defendants' motion for a directed verdict pursuant to Fed.R.Civ.P. 50. A full history of the case can be culled from two published opinions, *Rodríguez v. Banco Central*, 727 F.Supp. 759 (D.P.R.1989), and *Rodrí-*

*guez v. Banco Central,* 917 F.2d 664 (1st Cir.1990). Two unpublished opinions, docket entries numbers 535 and 566, will assist the reader in getting the pulse of the case. *See* Appendices A and B to this Opinion and Order. At the close of evidence, and after the court allowed adequate time for preparation, both sides argued extensively on the motion.

One hundred and fifty-two plaintiffs claim that an unscrupulous development company, along with the banks and individuals who financed the deals, promised them a chance to buy a lot in a beautiful residential subdivision near Disney World in Florida. Plaintiffs claim that the property was to be developed with schools, churches, and recreational facilities. What they were actually sold were one and one-quarter acre parcels of unimproved acreage, or what was described by witnesses as undeveloped swampland. It was perhaps a classic case for recovery · under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.,* which prohibits false statements made in connection with the sale of subdivided lots. It might also have made a cognizable contract, fraud, or unjust enrichment case under the Puerto Rico Civil Code, 31 L.R.P.A. §§ 3741–3891. But the Land Sales Act case fell to the statute of limitations, and the Puerto Rico law claims were never pled.[1] The case which finally

made it before the jury was under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), fraud in the sale of securities, in which plaintiffs alleged violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5), 17 C.F.R. § 240.10b–5, as the "predicate acts" making up the pattern of racketeering. Proceeding in this manner requires that plaintiffs prove as a threshold matter that the lots purchases in this case were "securities" within the meaning of the securities laws, and then that the defendants here all participated in the fraudulent misrepresentations connected to the *sale* of those securities, or at least knowingly aided and abetted in those misrepresentations. Plaintiffs have tried every twist and contortion to fit their round peg into a square hole, often with the help and indulgence of the court.[2] Ultimately, plaintiffs had the burden of proving a case consistent with the legal constraints of the law under which the case was actually tried, and not under a theory predicated on impermissible twists and bends to reach a deep pocket among otherwise judgment-proof defendants.

### Events Leading Up to the Purchase of the Land

In 1969, Miguel and Jaime Carlo, brothers, along with Jorge Palacios, incorporat-

---

1. Although no Puerto Rico law claims were pled, and neither side litigated this matter under such theories, plaintiffs' counsel moved orally at the close of trial to have the pleadings amended to conform to the proof by adding certain civil law theories to the case. We denied the request. Plaintiffs could well have chosen to include such claims as a part of their pleadings, filed in 1982, or to have added them to an amended complaint at a time when the defense and the court could have adequately dealt with the matter. To come to the court at literally the end of the trial and attempt to introduce entirely new theories of recovery not addressed in the pleadings and pretrial order is unacceptable. This record will reflect that this judge gave plaintiffs innumerable opportunities to get their act together. There can be no justification for this request.

2. As we pointed out in our Order docketed April 19, 1991, (Docket Document No. 566), we have kept plaintiffs' case alive through these proceedings so as to afford the plaintiffs every conceivable opportunity to make a case. Counsel have

not given us any great help in this regard, persisting in a confused and confusing presentation of both legal theory and evidence. Just a single example of the mismanagement of this case is the fact that in November of 1989 we certified five questions for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b), *Rodríguez,* 727 F.Supp. at 779, a procedure we consider extraordinary and very rarely invoked. Incredibly, plaintiffs' counsel failed to take the basic and rudimentary step of filing the notice of appeal with the appellate court within ten days of our judgment, and the court of appeals was forced to dismiss four of the five questions for lack of appellate jurisdiction. At trial, and in order to allow the plaintiffs one more opportunity at proving their case, we allowed the calling to the stand of four unannounced witnesses under the express representation by plaintiffs' counsel that their testimony would turn the case around. Defendants vociferously objected. The testimony was received only to show that the exercise was nothing but an attempt to discover facts as the case went along.

ed a company known as JC Investments, Inc. ("JC Investments") for the purpose of selling land in Florida. In early 1970, Jaime Carlo approached Luis Martínez Almodóvar ("Martínez Almodóvar"), then president of Banco Economías, with a request for financing from Banco Economías which would allow JC Investments to acquire certain properties in Florida which could then be subdivided and resold, primarily to persons living in Puerto Rico. At first the parties expected that the bank might be willing to provide a half million dollars in startup money for the project, but later the amount was reduced, since JC Investments could not provide the kind of security that the bank would require on a loan of that size. Instead, Martínez Almodóvar steered Carlo to an investors group in which he, Martínez Almodóvar, participated. The group, known as Empresa Financiera ("Empresa"), was a group of wealthy individuals willing to make high-risk, high-return investments to entrepreneurs in need of capital. Empresa was made up of Jorge Colón Nevares ("Colón Nevares"), Juan Martínez Echevarría ("Martínez Echevarría"), William de la Cruz ("de la Cruz"), Martínez Almodóvar, and others. At the time, Colón Nevares was a director of Banco Economías, Martínez Echevarría was Executive Vice–President of the bank, and, as stated above, Martínez Almodóvar was president.

A deal was worked out around January 15, 1970, whereby Banco Economías agreed to lend $238,000 and Empresa agreed to lend $100,000 to finance the JC Investments project. The loans were to be used for the down payment on the first parcel of land to be bought and was secured by a first mortgage for the portion of the land actually purchased by the lent money (as-suming segregation and, therefore, an unencumbered portion of the land), and an additional mortgage on the rest of the land. In exchange for the agreement to make the loan, Empresa received 33% of the stock of JC Investments, which was distributed to the principals in Empresa.[3] In addition, JC Investments was required to accept two of its five directors from the Empresa group.[4] Colón Nevares and Martínez Almodóvar took the two JC Investments directorships.

### The Land Itself—At Purchase Time and Throughout the Sales Period

JC Investments purchased the land which consisted of three tracts. Sunrise Acres was purchased first, followed by Sunrise East and Sunrise West. An architect/land-use planner testified for plaintiffs that as of 1970 in all of Florida there existed a regulation requiring that homes could not be built in flood prone areas since septic tanks could not be authorized in such areas. In view of this, flood prone areas needed extensive draining and water control infrastructure development before homes could be constructed. The experts seemed to agree that this is standard procedure in Florida, where draining land for homesite use is the rule rather than the exception. In 1971, Polk County, where the subject properties lie, adopted an ordinance requiring that property, before it could be built on, have frontage on highway or a county road. The ordinance applied to all property sold on or after June 25, 1971. The buildable lots, therefore, were reduced from all those not in the flood prone area to only those lots not in the flood prone area which also abutted a county road. In September 1974, Polk County adopted an ordinance specific to property in the Green Swamp areas (where

---

**3.** Not all principals in Empresa were sued here. We also note that Juan Martínez Echevarría joined Empresa Financiera around the middle of 1970. He was not related to said corporation at the time the $100,000 loan was executed in January 1970. Lastly, the record shows that the 33% of J.C. Investment stock was distributed to the corporation Empresa Financiera and to certain principals in Empresa, specifically Luis

Martínez Almodóvar, 10%, and Jorge Colón Nevares, 10%; Empresa retained 13%.

**4.** As will be discussed at greater length later, the evidence in the light most favorable to plaintiffs shows that these two directors from the Empresa group only acted as watchdogs of Empresa's interest in the loan, not in the ongoing operations of JC Investments and its lands sales.

all the subject properties lie) requiring that septic tanks, if such an alternative was considered in lieu of trunk sewer, would be limited to one per ten acres.

The combined result of these restrictions meant that at the time of the purchase of the first parcel, Sunrise Acres, only the lots not in a flood prone area could even conceivably have been built on as is, which amounted to only about 25% of the total. Each successive restriction reduced the number of buildable lots. According to plaintiffs' experts, at present only about 145 out of 2,400 lots could be built on in Sunrise Acres legally, 15 out of 282 in Sunrise West, and 4 out of 167 in Sunrise East. A second expert testified that even absent a legal prescription against building, it would be completely unfeasible, from a purely engineering standpoint, to attempt any kind of broad-scale housing, roads, or commercial development, since the water table in the area is so close to the surface.

One of the experts who testified was primarily engaged in the business of assisting developers with the physical, engineering, zoning, and other requirements for a given project. After examining the steps taken by JC Investments, and in light of the normal preparation that one would expect from a developer serious about planning a major development, it was the expert's opinion that no one involved with JC Investments at any time seriously considered providing roads, recreational facilities, schools, shopping centers or even the basic infrastructure to make a housing development possible.

### The sales campaign

A third Carlo brother, Ralph, joined JC Investments to assist with the sales campaign. The brothers carried out the campaign through a Puerto Rico corporation called JC Properties, Inc. (as opposed to the parent Florida corporation of JC Investments, Inc.). The sales people were set up as independent "brokers" who were paid commissions for the sales of lots.

Testimony regarding the sales campaign was remarkably similar. Most persons were approached by a relative, friend or coworker who introduced them to a JC Properties salesperson. Often the friend or relative had recently purchased a lot and was enthusiastic about the project. The potential buyer was then told about the virtues of the project. Plaintiffs testified that they were told that streets would be built, that tennis, riding stables, water sports, schools, shopping facilities, and other improvements would be provided in the project, and that the buyer could build a home there.

The slick promotional materials used by the salespeople show golfing, boating, hiking, fishing, tennis, and shopping. The court's own review of the promotional material reveals that while it is true that the materials give a generally rosy view of the area, and show people engaging in sports, going to water shows, and the like, each of these photos is clearly marked as depicting a place *near* but not on the subject land, along with a notation of the mileage to the touted site from Sunrise Acres. Plaintiff's Exhibit No. 6, for instance, is a glossy 11" by 14" foldout. The front cover shows a house and is titled by the inscription "Property with Potential in the Heartland of Florida's Future ...!" Lower on the page it states in ⅛th inch letters that "[t]hough not a homesite offering Sunrise Acres has a Lodge as shown above." Inside the foldout are photos. Next to a photo of fishing is the inscription: "Fishing in Lake Agnes (Polk City) 4 miles from property." Next to the photo of golf it states: "Lone Palm Golf—16 miles." Next to a couple playing tennis: "Tennis (Lakeland 16 miles from property)." The sales people had maps which appeared to show plans for roads running throughout the project. They showed maps which divided the land into "commercial" and "residential" areas.

Along with the upbeat side of the promotional materials was a constantly reiterated cautionary statement that the land was undeveloped and that the offer did not include development. In the slick photo foldout referred to above, for instance, it states that:

Like much of Florida land being offered to perceptive purchasers today, the property comprising SUNRISE ACRES is in a natural, undeveloped, unimproved, unsurveyed state. Improvements such as roads and drainage are not presently on the property and are not contemplated. The property described herein is not usable for building purposes. It is undeveloped, unimproved, unsurveyed acreage without roads, drainage or other improvements. The seller is not obligated to provide any improvements. 35% is marsh or swampy, it is located in an area known as green swamp and it is subject to flooding.

Essentially the same message is set out in the sales contract and in the "Florida Land Sales Board Offering."[5] The cautionary statement and contract documents were required by a government agency, the Florida Land Sales Board, and were approved by the Board prior to their use. As stated, the warnings also appear on the face of the sales contract itself, in both Spanish and English, in type larger than the rest of the type used in the contract, and highlighted by a small box.[6] The evidence shows that few plaintiffs ever read the contract, the offering statement or any other red-flag language in the promotional materials.

The standard response from sales people to a query about the cautions contained in the contract and offering statement was that it was merely a government requirement to provide it, and that it accompanies *all* land sales in Florida, since all of Florida land is low. Another response was that although 35% of the land was indeed low land, the particular lot being sold was a high lot and, therefore, not a problem. Finally, many purchasers were told that although some of the land is currently marshy, the proposed development would provide for drainage, and the water would be collected in ponds or lakes. In the sales training manual, the following suggested answer to an objection about the "35% swampy" warning was as follows:

> *OBJECTION*: ... But it says here that this has 35% of low zones; what does that mean.
>
> *ANSWER*: Mr. Prospect, you must sign this document because in this way we make known the seriousness of our operation. Sunrise Acres is an extremely big extension of land 3,000 acres with levels of 120′ and 150′ above sea level ... it's natural that there is a part lower than the rest.

### Knowledge on the Part of the Financiers of Marketing Techniques

The record is devoid of any information which might shed light on how much the financiers knew at the time of the initial investment about the utility of the land itself or the manner in which JC Investments planned to market the land.[7] In fact, there is nothing in the record to suggest that at the time of the original loans the Carlo brothers themselves or persons under their direction had yet devised the sales scheme and marketing tactics which the plaintiffs complain of here. Colón Nevares, the financier who plaintiffs' evidence most clearly targeted as one with knowledge, testified that he had nothing to do with the sales campaign and attended no board of directors meetings after the initial loans were made. Instead, he testified that he met informally and infrequently with the Carlo brothers as to financing matters only. Nothing in the record substantially undermines that testimony. No testimony

---

5. Although the great majority of the plaintiffs testified to having not read the contract documents despite having signed a receipt attesting to having read them, and others testified that theirs were English versions, which they did not understand, we see no need to analyze such factual dispute. Simply, plaintiffs cannot deny what the documents say, and we only lay out the general sales campaign here for the purposes of the motions at hand.

6. A sales contract for Sunrise Acres and the Florida Land Sales Board-approved offering statement are made a part of this Opinion and Order as Appendices C and D. The record also contains the same kind of documents for Sunrise West and Sunrise East.

7. Plaintiffs' counsel called to the stand as part of their case all the financiers they understood could prove their case. The record will reflect the great latitude afforded them in the process.

shows that Martínez Almodóvar, although on the Board of JC Investments' directors as a result of the original loan agreement, had any direct contact with the Carlo brothers regarding the operation and sales of the project whatsoever. Although there was testimony that bank officers visited the land in 1971 or 1972, there was no evidence to suggest that a mere visual inspection would have revealed the unsuitability of the land for development. In fact, many of the purchasers themselves testified to visiting the land before or shortly after purchasing and being delighted because it was a beautiful tract. Bank personnel, like Martínez Echevarría, testified that at some time early on in the process they saw the Florida Public Offering statement. They had no reason to be alarmed at the warning of "undeveloped, 35% swampy," since they believed that what they were financing was precisely that, undeveloped lots of land. The critical "knowledge" on the part of the financiers that plaintiffs must prove is knowledge of the sales campaign, and the way in which it diverged from the reality of what was being sold. This they failed to do.

On March 2, 1978, the Florida Land Sales Board issued a temporary cease and desist order against the sale of lands by JC Investments after a Mr. Dail, an investigator for the agency, determined that the company was misrepresenting that the lots could be utilized for homesites when that was not the case. Dail came to Puerto Rico, met with the Carlo brothers, and also, separately, with Edwin Vélez, who at the time was Real Estate Manager for Banco Central & Economías. Dail told Vélez of the result of the investigations, and the concern that fraudulent practices were being made in connection with the sales. After the Carlo brothers attributed the misleading information to a few "bad apple" sales representatives, the cease and desist order was lifted with the consent of a federal bankruptcy court.[8]

### Financing of the Individual Sales

At the outset, JC Investments sold lots directly to buyers "financing" the transaction by taking a deposit and having the individual sign a sales contract with JC Investments for monthly payments to pay off the balance. Title was to be transferred after the full contract price with interest was paid off and a warranty deed was issued. By July of 1970, JC Investments and Banco Economías had reached an agreement whereby the bank agreed to set up an escrow account to receive the payments to JC Investments on the lots. The bank issued coupon booklets and charged JC Investments $1.50 for each payment processed in this way.

JC Investments' financial situation in the first two years of operation was not good. In addition to the original financing, JC Investments had to look to Empresa Financiera for additional financing throughout 1971 and 1972. By late 1972, JC Investments had ceded 56% of its stock to the Empresa group, or its members, as additional security for additional loans. In November of 1972, JC Investments repurchased all of its own stock and issued promissory notes to Empresa and its principals for some $400,000.[9] *See* Plaintiffs' Exhibits 71, 72. Sales contracts were held

---

8. At this time, JC Investments had filed for Chapter 11 bankruptcy relief. The record shows that the issue of the cease and desist order was the object of review, a stipulation, and approval by the bankruptcy court.

9. Although not relevant to today's decision, we note that JC Investments' failure to pay the mortgage on the entire tract of Sunrise West resulted in a 1979 foreclosure by Walter F. Fusall, who held first mortgage on the property from the original sale to the Carlo brothers. Many purchasers in Sunrise West lost their opportunity to get title in that procedure. While that fact certainly has legal consequences, we need not be concerned with it, since the issues before us are whether there was a security, whether there was an enterprise which existed to sell the security, and whether there is proof that certain defendants actually aided and abetted in the sale of such securities. That JC Investments failed to clear title as promised goes to the issue of whether a common law fraud occurred during the sale or perhaps implicates a contract issue, neither of which do we need to deal with here.

as collateral and an escrow account was set up for payment on those contracts so that in the event JC Investments failed to pay on the notes, the Empresa group could look to the payment on sales contract to recover their debt. Empresa members also received land in Sunrise Acres in partial payment of the debt owed to them.[10] The November 1972 deal marked the end of Colón Nevares' and Martínez Almodóvar's roles as directors and stockholders of JC Investments.

In addition to drawing on the resources of the Empresa group, JC Investments sought to better its cash flow by drawing on the personal loan capacity of the bank. Whereas the first sales contracts were financed by JC Investments itself and merely serviced in an escrow account at the bank, by 1973 the bank was actually financing sales and refinancing sales already made, through a personal loan program. For refinancing, JC Investments would contact a purchaser who already had a land sales contract and offer the person a better deal through a personal bank loan to finance the portion remaining. If the bank approved the buyer's loan application, the buyer would sign a new sales contract with JC Investments and a note to the bank for the remainder of the amount due would issue.[11] The bank would then forward to JC Investments the amount financed. JC Investments cosigned all the personal loan notes as guarantor. As to new sales, the bank would finance 50% of the initial sales price, paying the amount financed to JC Investments, taking a $200 payment from JC Investments for making the loan, and looking to the buyer for repayment, along with a JC Investments cosignature. Any remaining balance would be owed to JC Investments directly and paid in installments at the end.

### Dissolution of Banco Economías, Creation of Banco Central Corp.

The situation of sales, financing, and refinancing continued through the mid 1970's. By 1977, Banco Economías, like a few other banks in Puerto Rico at the time, was in a precarious financial condition. The Federal Deposit Insurance Corporation (FDIC), in connection with the Department of the Treasury of Puerto Rico, sought a buyer for Banco Economías as a method of avoiding a full scale failure of the bank and the concomitant economic fallout that would result from such a closure. The two governmental entities agreed to a plan whereby the FDIC would take over $15 Million worth of bad loans in exchange for an agreement by a healthy bank to purchase Banco Economías and restore it to a profitable banking entity. The bank which answered the call was Banco Central, S.A., a Spanish bank. In a transaction veiled in secrecy and carried out with the utmost haste,[12] Banco Central, S.A. agreed to purchase the "assets and liabilities" (the meaning of which we will discuss later) of Banco Economías in exchange for the FDIC's taking over the bank's worst loans. Banco Central, S.A. also agreed to invest a large sum in the new bank to recapitalize, and to keep on virtually all of the Puerto Rican staff of Banco Economías. On September 2, 1977, the new bank was born and named Banco Central & Economías, later changed to Banco Central Corp. After the date of the creation of Banco Central Corp., only nine refinancings of prior purchases occurred and no new sales were financed. The last refinancing occurred on February 10, 1978. Mr. Vélez, Banco Central's Real Estate Manager, testified that Mr. Campos, the new president of the bank, felt that the bank should not be in the consumer loan business, and the funding for loans in that area, including the JC Investments purchases, dried up under the new bank presi-

---

10. It is odd, to say the least, that these financiers, claimed to be fraudulent land sellers, accepted the very land subject of this suit as partial payment of JC Investments debts to them.

11. There is no evidence that the requirement of a new contract had any relationship with the approval of the personal loan by the bank or that the bank participated or knew of the fact that new contracts were being subscribed.

12. The sale of the bank was carried out in this fashion to avoid panic and a run on the bank.

dent.[13]

## Directed Verdict Standard

The standard to be applied for determining whether a directed verdict is warranted is well settled. We must decide whether:

"[V]iewing the light most favorable to the nonmoving party, reasonable jurors could come to but one conclusion. We must give plaintiff every benefit of every legitimate inference. However, such inferences may not rest on conjecture or speculation, but rather the evidence offered must make "the existence of the fact to be inferred more probable than its nonexistence.""

*DiPalma v. Westinghouse Electric Corp.*, 938 F.2d 1463, 1464 (1st Cir.1991), *quoting from Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Particularly relevant to the case at bar, focusing for a moment on the issue of whether the financiers had knowledge of the nature of the sales campaign carried out by JC Investments, is the adage that:

The party with the burden of proof does not make an issue for the jury by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred.

9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2527 (1971).

We keep these standards ever present as we view the evidence adduced at trial, indulging marginal situations in favor of the plaintiffs.

## Association-in-Fact

Defendant Banco Central urges that the plaintiffs have failed to identify an association-in-fact separate from the "persons" who can be the defendants under the statute. We note at the outset that plaintiffs had been proceeding, until trial, on two alternative theories of who was the enterprise.[14] The first theory discerned by us held JC Investments as the enterprise with which all the defendants (JC Investments excluded) associated. The second identified an association-in-fact including all the defendants. During argument of the Rule 50 motion, on direct questioning from the court, plaintiffs' attorney surprisingly adopted the second theory and abandoned the first, easier to deal with, classical, logical theory.

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

■■■ The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Section 1961(4) (emphasis added). The phrase "group of individuals associated in fact" has been interpreted to include organizations of associated in fact corporations, natural persons and other entities.[15]

---

**13.** The testimony at trial made clear that the relationship between Banco Central and JC Investments after the sale was very cold. As a matter of fact, one of the plaintiffs produced a consensual tape recording of a conversation had with Miguel Carlo, where Carlo specifically said that Banco Central y Economías (the Spaniards) had literally pulled the rug from under their feet.

**14.** A reading of our published opinion appearing at 727 F.Supp. 759 shows that this judge took plaintiffs by the hand and suggested ways in which they could replead their enterprise.

Such opportunity was given then. The reader of the resulting pleading and eventual theory exposition in the pretrial order will realize that even with the court's assistance, the pleading of the enterprise is by no means clear.

**15.** Defendant Banco Central urged at the close of evidence that the word "individuals" in the associated in fact phrase in the statute should be read to include only natural persons, not corporations or other legal entities. Although we could only find one reported case taking this position, *Benard v. Hoff*, 727 F.Supp. 211, 215 (D.Md.1989), and a whole slew of circuits going

*Yellow Bus Lines Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 141 (D.C.Cir.1989), *decision unaffected by en banc decision*, 913 F.2d 948 (D.C.Cir.1990) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114 (D.C.Cir.1991); *United States v. Hughes*, 895 F.2d 1135, 1142 (6th Cir.1990); *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 995 (8th Cir.1989). Under 1962(c), the enterprise and the "person" who violates the statute must be distinct from each other, the former being exempt from liability, the latter being the targeted defendant. *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986). The distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact, since a corporation acts through its employees, subsidiaries and agents, and would thereby be merely associating with itself. *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987); *Brittingham v. Mobil Corporation, et al.*, 943 F.2d 297 (3rd Cir.1991); *Yellow Bus Lines*, 883 F.2d at 141 (collected cases); *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349 (3rd Cir.1987); *Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3rd Cir.1984); *Langley v. American Bank of Wisconsin*, 738 F.Supp. 1232, 1241 (E.D.Wis.1990). Where the plaintiffs have suffered harm at the hands of an enterprise that consists only of a single corporation and its employees, subsidiaries or agents, the plaintiffs "must choose between the corporation and its constituents as persons liable." *Langley*, 738 F.Supp.

at 1241. If the plaintiff chooses to identify the corporation as the enterprise through which its employees, as persons, conducted the RICO activity, the corporation is insulated from liability. *Id.* It is for this reason that plaintiffs often try to prove the more intricate association-in-fact, in order to save as defendants all the corporate entities in the scheme, often the deep pockets. The association-in-fact route, however, provides its own hazards.

■ Whereas the "legal" entity like a corporation or partnership is deemed to be a continuing organization with an identifiable structure as a matter of law, the plaintiff alleging an association-in-fact must prove the ongoing associative nature of the relationship. The association-in-fact enterprise "must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir.1987); *Atlas*, 886 F.2d at 995. "Continuity or the ongoing nature of an association-in-fact is the linchpin of enterprise statutes." *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 749 (5th Cir.1989).

■ The "enterprise" can be one with primarily legitimate or illegitimate ends. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). In proving a RICO case, a plaintiff must show not only the existence of a pattern of racketeering, but must also prove the existence of the enterprise as a functioning unit with a structure apart from the mere coming together of the participants for purposes of

in the other direction, we actually believe that Banco Central's position is a much sounder reading of the statutory language, and seems not to be directly contradicted by any of the legislative history surrounding passage of this section. However persuaded we might be, however, law of the case considerations preclude us from espousing that novel theory at this late date. In our November 1987 decision in this case, we specifically advised plaintiffs that they could associate in fact the various corporations and natural persons in this case (assuming that they could prove that an association in fact did indeed take place). *Rodríguez v. Banco Central,*

727 F.Supp. 759, 772 (D.P.R.1989). In reliance on that decision, plaintiffs here have specifically chosen the association in fact theory, and have abandoned the theory that JC Investments is the enterprise. To suddenly change our ruling now at the close of evidence would work irrevocable harm on plaintiffs' case. Although the doctrine of the law of the case admittedly does not require a court to adhere to its own prior decisions when it later decides them to be clearly misguided, it should be considered where the parties have obviously conformed the presentation of evidence in reliance on the court's ruling.

committing the criminal predicate acts. *Id.* at 583, 101 S.Ct. at 2528. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* While the predicate illegalities may often overlap with the common purpose for which the associates came together in the first place, they need not. A plaintiff could conceivably prove an association-in-fact that is completely legitimate except for the fact that one of its associates is using the entity, even perhaps without the knowledge of any of the other associates, for the purpose of engaging in the RICO predicate act pattern, in the same way that the associated-in-fact enterprise, just like its legally-constituted corporate or partnership analog from the "legal entity" phrase in the statute, may merely be an innocent tool used by the evil RICO actor. Therefore, in searching the record for proof of the existence of the enterprise in this case, we must search for an "organization" created among the defendants here which is apart from the alleged co-participation in the RICO acts which allegedly make up the pattern. Defendant Banco Central argues that plaintiffs have failed to adduce at trial any proof sufficient to support a finding that the defendants have proven an association-in-fact of the various defendants in this case. Essentially, Banco Central argues that the financing "wing" of the supposed enterprise, Banco Economías, Empresa Financiera, Jorge Colón Nevares, Juan Martínez Echevarría, Luis Martínez Almodóvar, William de la Cruz, and others connected to JC Investments through those entities and individuals are really merely "agents" of JC Investments. If that were so, then the plaintiffs would really be alleging an association-in-fact which was no more than JC Investments and its own employees and agents, a position which is precluded by the distinction rule.

■ Banco Central supports its argument with reference to the fact that the plaintiffs had admitted that none of the financiers (organizations or natural persons) could possibly be held as principals in their own right, since none actively participated in the development or distribution of the allegedly false sales material. Instead, their liability lies, if at all, as aiders and abettors. Therefore, reasons Banco Central, the liability of those parties, if at all, would be vicariously asserted through the persons whom the financiers aided and abetted. If their liability is purely "vicarious", they cannot be said to be individuals at the association-in-fact table. Taking away all those from the financing side of the deal, we are left only with JC Investments and its various agents as the association-in-fact, a legally unsustainable position.

■ This argument, that aider and abettor liability is not enough to win a place at the association-in-fact table, is wrong because the identification of individuals who associate in fact for purposes of identifying the enterprise need not have anything to do with whether or not those individuals are the persons who committed predicate acts. *Atlas*, 886 F.2d at 996 (legitimate enterprises make up association-in-fact). Since the association-in-fact itself can be completely innocent, just like the corporation in the case of a single corporation identified as the enterprise, we see no reason to assume that it cannot be constituted of individuals, apart from one or a few RICO violators, who are totally innocent of wrongdoing. Therefore, not only do plaintiffs fail to defeat their own attempt to portray an association-in-fact by admitting that the connection of the financiers, if at all, was purely vicarious through aiding and abetting, even an admission by plaintiffs that the financiers were completely ignorant and innocent of any wrongdoing would still not be dispositive of the association-in-fact question. Even if only a single corporation and its own employees are the only wrongdoers, plaintiffs seeking to hold them responsible can satisfy the association-in-fact requirement so long as the wrongdoers had entered into an association of individuals other than themselves, and that the RICO activity grew out of the wrongdoers' manipulation of the association-in-fact organization.

 Having dismissed defendant's argument that an association-in-fact must be an association of wrongdoers, we go on to see whether an association of any kind was formed. The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528. Even if we take out of our consideration any of the allegedly nefarious agreements, a reasonable factfinder could conclude that JC Investments, Empresa, and at least Banco Economías had a long standing association that transcended that of ordinary borrower/lender. Shared personnel, repeated deals, financing and refinancing, struggles for the control of JC Investments stock, multiple infusions of capital, and other indicia of the links between the various associates all point to a structure other than that formed by JC Investments and its employees. Defendant Banco Central urges us to adopt the rule in *Foval v. First National Bank of Commerce*, 841 F.2d 126 (5th Cir.1988), which defendant says would preclude the finding of an association-in-fact in the case at bar. In *Foval*, a company had a loan from a bank, which was secured by company stock and a guarantee of the stockholders. One of the co-owner stockholders sold his share of the company to a third person in exchange for cash and a promissory note. The bank agreed to release the former co-owner from the guarantee for an agreement that the promissory note to the former co-owner would be subordinated to the payments by the company on the bank's loan. The *Foval* court refused to find an association-in-fact between the bank, the selling co-owner, the company, and the purchasing co-owner. The court found that the arrangement amounted to no more than a one time loan and a subsequent refinancing of the loan when the situation in the company shifted. The case at bar

has a record of interaction between JC Investments, Empresa, and all the various natural persons over a many year period which goes far beyond the single-loan arrangement in *Foval*. Although the presence of financiers will not always serve to create an association-in-fact between themselves and the financed company, we believe that where the relationship is multifaceted, long-standing, involves shared personnel, resources, and control, a fact-finder would be within the range of reasonableness to conclude that the locus of operations was sited not merely in the financed corporation, but in the association of both financiers and financed that allowed the deal to happen.

But finding an adequately pled enterprise only leads to the question of whether the violation has occurred. Defendant Banco Central's next line of defense is that even if there was an enterprise of which the financiers constituted a part, no predicate act occurred, since there was no security and, therefore, no fraud in the sale of securities. That failing, they argue that at most the Carlo brothers and JC Investments only are liable since there is no proof to support a finding of aiding and abetting liability by any of the individuals other than the Carlo brothers, nor by any of the corporations besides JC Investments and its affiliates. We agree with Banco Central on all counts.

### Is it a Security?

In our November 1989 summary judgment decision we held that the record needed fuller factual development before it could be determined whether the land sales contracts in this case amounted to "securities" triggering the predicate securities law provisions which constitute the predicate acts of the RICO claim before the court. *Rodríguez v. Banco Central*, 727 F.Supp. 759 (D.P.R.1989).[16] We now review the

---

**16.** On said occasion, we were convinced by the opposing papers to the then pending motion for summary judgment, that plaintiffs might well be able to prove the promotion of the property as a commonly funded investment project. As we said then, "[t]o the extent that these improvements were to be made with dues or with pur-

chase price money from lot sales, the scheme falls within the 'common enterprise' definition." *Rodríguez*, 727 F.Supp. at 767; *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975). After trial we find plaintiffs' proof expectations to remain unrealized.

standard in light of the evidence produced at trial.[17]

■ The Securities Act of 1934 defines "security" to include, *inter alia,* an "investment contract". 15 U.S.C. § 78c(a)(10). The Supreme Court has defined an investment contract to include any "[1] contract, transaction or scheme whereby a person invests his money in a common enterprise and [2] is led to expect profits [3] solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). The concept is to be applied flexibly. *Id.* at 299, 66 S.Ct. at 1103. In examining real estate sales contracts to determine whether they can qualify as investment contracts, and therefore securities, "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived *from the entrepreneurial or managerial efforts of others.*" *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (emphasis added). In the classic land "investment contract", the sale of the land by the promoter is merely incidental to the primary reason for the sale, which is to open the way for the operation of a commercial enterprise on the land financed through the sales but carried out by the developer or a third party. The inducement to the land purchaser is not the intrinsic value of the land *per se,* but rather the expected profits from the efforts of the seller of the land. In *Howey,* for instance, the Court found an investment contract where the seller of citrus groves also sold along with the land a service contract for the cultivation and marketing of the fruit, along with an agreement that a portion of the profits from the sales would inure to the buyer of the property. In

*S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the Supreme Court found a security to exist in the sale of plots of land where the sales were effectuated to provide the financing necessary to enable the sellers to drill a test oil well on the land sold. "[T]he undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348, 64 S.Ct. at 122.

Real estate sales of residential space have been more problematic for courts, since the issue of whether the purchaser is "investing" or merely "consuming" can be very murky. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Court found no investment contract in the sale of apartment ownership shares in a low-income cooperative. The shares were sold to persons on the basis of their income and enabled them to become the owners of the apartment which they could then occupy. The entire enterprise was not-for-profit, the tenant/owner could not rent out the space to another, and if the tenant/owner wished to sell and move out, the Cooperative had the right to purchase the apartment back at the original purchase price, thereby precluding the possibility of profit realization for the tenant. The Court wrote that "[w]hat distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use." *United Housing Foundation,* 421 U.S. at 858, 95 S.Ct. at 2063.

■ While the Supreme Court has delineated the two ends of the land sale

---

**17.** Even though plaintiffs elected not to argue the issue of security when we heard the parties on the motion for a directed verdict, subsequently we asked plaintiffs to give us a list of their eight best examples of witnesses who support their theory that the sale was a sale of a security. Although we reviewed the evidence of all plaintiffs, we relied most heavily on plaintiffs' own list so as to give them the best opportunity to prove that they had brought forth sufficient evidence to support their position. For reference purposes, the eight identified to us by the plaintiffs were: Nicolás Ayala Pláceres (Tr. at 1513); Alejo Pérez Ortiz (Tr. at 2745); Jesús Santana Leduc (Tr. at 2920); José A. Carrasquillo (Tr. at 3034); Héctor Fontanet (Tr. at 3392); Heriberto Alvarado (Ana Santos) (Tr. at 3924); Andrés Rodríguez (Tr. at 3970); Carlos Ayala Canales (Tr. at 4696).

spectrum, with *Howey*'s pure "profit-from-efforts-of-another" driven investment on the one side and *United Housing*'s pure personal consumption on the other, lower courts have had to develop a conceptual framework to parse the mixed motive situations that litter the middle of the continuum. Several *leitmotifs* have surfaced which help to guide the inquiry. First, "where those who purchase something with the primary desire to use or consume it, the security laws do not apply." *Rice v. Branigar Organization, Inc.*, 922 F.2d 788 (11th Cir.1991) (Powell, Associate Justice (Retired), United States Supreme Court, sitting by designation); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 (10th Cir.1980); *Fogel v. Sellamerica, Ltd.*, 445 F.Supp. 1269, 1277 (S.D.N.Y.1978). Second, expectation of profit from the general appreciation in the value of land must be disregarded for purposes of identifying a "security". *McCown v. Heidler*, 527 F.2d 204, 208 (10th Cir.1975); *Aldrich*, 627 F.2d at 1039, n. 1 ("[c]apital appreciation through development should be distinguished from a general increase in land values concurrent with neighborhood growth and improvements"). Third, the purchasers must show that they purchased at least in substantial part in reliance on a collateral agreement in which the developer or third party's managerial or entrepreneurial obligations are set out. *Dumbarton Condominium Assoc. v. 3120 R Street Associates Ltd. Partnership*, 657 F.Supp. 226 (D.C.1987). Fourth, the collateral agreement must have some degree of "horizontal commonality", meaning that the fates of the investors are intertwined through the pooling of common funds to be used for the common development to benefit all. The fate of each investor must rise or fall together. Vertical commonality, defined as a developer's individual promise to a purchaser to make improvements, is not enough. *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir.1984).

In *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir.1978), the Tenth Circuit faced a factual scenario very similar to the one in the case at bar. The defendants sold lots in what was promoted as a planned residential community. "Included in the plans were shopping centers, health and cultural facilities, transportation facilities, and abundant recreational opportunity, including a golf course and a lake." *Woodward*, 574 F.2d at 1025. Most of the plaintiffs purchased the lots with the intention of building on them, although several did not intend to build and bought the land as an "investment". A land sales contract was entered into which provided for the sale of the lot along with some rudimentary developments such as underground sewage, water, and a curb. The court found that the planned community facilities which were a part of the promotional materials did not turn an ordinary land sales contract into a security. The court looked to the actual obligations of the developer vis-a-vis the group of purchasers as a whole, and found that a collateral agreement to engage in wide scale development through the use of common funds that would then generate a return on investment to the purchasers was missing.

> [The developer] itself was involved in a business venture. [The developer] was developing a new residential community. As part of its venture [the developer] sold lots to persons who either intended to build a house thereon, or intended to resell to others who would so build. But the mere fact that the plaintiffs bought lots from [the developer] does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with [the developer] The only contractual agreement between plaintiffs and [the developer] was the Uniform Real Estate Contract. [The developer] was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met. Unlike *Howey*, [the developer] was not under any collateral management contract with the purchasers of its land.

*Woodward*, 574 F.2d at 1025. In *De Luz Ranchos Inv. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir.1979), the Ninth Circuit applied the same reasoning to find that a sale of subdivided, undeveloped land could not be considered an investment con-

tract despite promotional material speaking generally about the developer's plans for further development of common facilities within the project where the contract obligated the seller to do no more than transfer title to the property. As stated succinctly by the court in *Hart*, 735 F.2d at 1004, "[t]he mere fact that an assurance of development to each investor may have come from the same seller does not satisfy the requirement of horizontal commonality."

This position is not inconsistent with the holding of the Tenth Circuit in *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975), a case we relied on heavily in our November 1989 opinion in which we refused to rule on the securities issue strictly on the papers. In *McCown*, the court found that summary disposition was inappropriate where the facts pled allowed for the possibility that the plaintiffs could prove at trial "the sale of a contractual promise by [the developer] to improve the project, including the construction of a country club, an 18–hole championship golf course, stables, equestrian center, tennis courts, clubhouse and swimming pools." *McCown*, 527 F.2d at 209. As the Tenth Circuit itself pointed out in *Woodward*, 574 F.2d at 1026, *McCown* stood only for the proposition that such an issue required a more full fleshing out of the facts than mere motions could provide. In following *McCown* we were merely providing plaintiffs with the *opportunity* to prove the sale of a contractual promise of common horizontal development. We leave the *McCown* decision behind when we come to the point of deciding whether they have done so.

▮▮▮▮ In reviewing the facts of the case set before us, we note that we do not look only to the four corners of the land sales contract in determining the existence or absence of an investment contract. Promotional materials, oral assurances, and merchandising approaches are all relevant. *Aldrich*, 627 F.2d at 1039. "Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale." *Id.*

"[B]oilerplate disclaiming inducements to purchase land as an investment should not deter the court from considering all the evidence bearing upon the true nature of the purchase." *Timmreck v. Munn*, 433 F.Supp. 396, 401 (N.D.Ill 1977). We read *Woodward* and *De Luz* not to be inconsistent with that position. Although both courts relied in part on the fact that the contract of sale required no more than the passing of title, we think that neither court set a rule precluding a court from considering the oral statements which accompany a sale. Indeed, both courts examined the oral aspects of the sale and the general sales atmosphere in the cases before them. In holding that no collateral managerial or entrepreneurial contract sufficient to satisfy the horizontal commonality requirement existed, the courts in both *Woodward* and *De Luz* were evaluating the dubious nature of the development "promises". The driving force behind the refusal to find agreements seems to lie not in the fact that they were oral, but rather in the fact that they were so general, not time specific, and contained none of the parameters that one would ordinarily expect from a legally binding agreement. Secondly, in both cases, even if development promises were made, there was no commonality to the plan which would result in fund pooling or subsequent management by the developer. Although we do not necessarily think that for a collateral management or development agreement to qualify as such for the purposes of finding a security the agreement must stand up to the technicalities of contract law and its corollary evidentiary rules such as the statute of frauds, at least the proof of the agreement must be more than general assurances or lofty optimism. We believe, therefore, that a plaintiff might well prove the existence of a security despite a written land sales contract which does no more than require the transfer of title where the plaintiff can show that the sales pitch made specific promises of development within a given time frame and which specifically recited the common nature of the financing and so forth. We go on to examine whether plaintiffs here have

**1060**

brought out facts sufficient to make out a case for the existence of a security.

We start by noting that the vast majority of the plaintiffs testified that while they considered the purchase an "investment" in that it would increase in value with the passage of time, they ultimately hoped to build on the land. Many purchased the land with the hope of retiring there. While purchase for personal use tends in the direction of not finding an investment contract, we do not give it too much weight for two reasons. First, at least some plaintiffs did not intend the land for purely personal use, particularly those who bought multiple parcels. Second, the defendant Carlo brothers, in asserting that they defrauded no one, have argued from the start that the land was never offered as a "homesite" offering. It would indeed be ironic if defendants could now defend against the finding of a security by alleging that plaintiffs purchased the lots planning to build homes when at the same time vigorously denying that the sale of lots was intended for the purpose of building homes, and denying that the impression was given that the lots could be used for homesites. We therefore find that the emphasis by many of the buyers on the desire to build a home, although ordinarily signifying the absence of a security, is not fatal under these circumstances. We go on to the other necessary elements, however, and we find that no amount of generosity to plaintiffs in light of the facts elicited can construct an adequate foundation to support the investment contract theory.

Just as in *Woodward* and *De Luz*, the *best* that the plaintiffs can hope to argue from their facts is that the developers made some "vertical" promises to provide the basic improvements expected in a residential development. The "usual" improvements that go along with a residential project, *even when specifically set out in the contract of sale*, do not amount to an investment contract. Here the contract specifically negates such a promise, but we indulge the plaintiffs' case at every juncture. *Woodward*, 574 F.2d at 1023. Even the promise to build roads and other improvements consistent with a residential

development does not amount to the "type of managerial service contemplated in *Howey*,[ ] or *United Housing*," *Davis v. Rio Rancho Estates Inc.*, 401 F.Supp. 1045 (S.D.N.Y.1975) (citations omitted). Plaintiffs have perhaps also extracted the evidence to prove that the developer's salespeople pushed the project with the vision of future construction of schools, stores, and recreational facilities. As the case law shows, however, without some specificity in those "promises" as to time frame and the promise or actuality of pooled financing, the developer's own lofty generalized predictions as to plans to engage in commercial or common facilities development does not constitute the kind of cognizable collateral agreement of horizontal commonality that can trigger the protection of the securities laws.

Nor do we think that the result is altered by either the $10 annual per lot "fee" which was charged for "maintenance", *Timmreck v. Munn*, 433 F.Supp. 396, 400 (N.D.Ill.1977), or the supposed promise that there would be a country club for use of the purchasers through purchases of memberships. *Rice*, 922 F.2d at 790–91. As to the lot fee, the amount is so insignificant in comparison to a multi-million dollar project that the purchasers cannot fruitfully argue that they expected a common development company to be born of that sum. Since we are required to exalt substance over form, and endeavor to make a decision based on the economic realities of the relationship between buyer and seller, as a matter of law we do not believe that a $10 per year lot maintenance fee creates the existence of a horizontal common scheme of development. As to a country club membership, (which incidentally was paid by only two of hundreds of buyers, neither a plaintiff before this court), Justice Powell, sitting on the Eleventh Circuit, recently rejected the argument that the sale of undeveloped land along with a right to purchase a country club membership turned the ordinarily land sales contract into an investment contract. *Rice*, 922 F.2d at 790–91.

In light of the facts fully developed at trial, viewed in the light most favorable to

plaintiffs, we cannot see that any reasonable factfinder could find that what was sold to the plaintiffs in this case on written documents or oral promises amounted to an investment contract and, therefore, a security for purposes of securities law protection. Since there is no security, there can be no securities law violations as predicate acts, and no RICO action may lie against any of the defendants here.

*Aiding and Abetting of the Financiers*

Even assuming the existence of a security and a pattern of securities fraud predicate acts on the part of the Carlo brothers and JC Investments and its affiliates, Banco Central argues that there is no proof on this record to implicate the financiers, Jorge Colón Nevares, Juan Martínez Echevarría, Luis Martínez Almodóvar, William de la Cruz, and the financing institutions Banco Economías, Empresa Financiera, and Banco Central as aiders and abettors of the primary violations.[18] We agree.

■■■ Civil RICO liability can be based on aiding and abetting the commission of the predicate acts by the primary offender. *Petro–Tech,* 824 F.2d at 1356; *Zola v. Gordon,* 685 F.Supp. 354, 375 (S.D.N.Y.1988). In order to prove aiding and abetting in the context of a securities law violation, there must be a primary securities law violation, knowledge of the violation on the part of the aider and abettor, and substantial assistance on the part of the aider and abettor to help bring about the primary violation. *Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988); *Jett v. Sunderman,* 840 F.2d 1487 (9th Cir. 1988) (financing bank not liable absent proof of actual involvement in the fraudulent sale which their financing helped to bring about); *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986); *Zola,* 685 F.Supp. at 375–76. In the absence of a duty to disclose, the scienter requirement for securities fraud and, therefore, the scienter requirement attributed to the aider and abettor, is elevated to that of

"high conscious intent." *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909 (2nd Cir.1980); *In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 666 F.Supp. 547 (S.D.N.Y.1987).

■■ The fact that Colón Nevares and Martínez Almodóvar acted as directors of JC Investments for a time and with the purpose of keeping an eye over the corporation they had lent money to does not make them either *per se* liable to purchasers of "securities" sold through the misrepresentations of JC Investments since "[i]t is an established principle of corporations law that corporate directors are not liable merely be virtue of their office for fraud or other tortious wrongdoing committed by the corporation or its officers," *L.B. Industries, Inc. v. Smith,* 817 F.2d 69, 71 (9th Cir.1987), nor does it create a duty to disclose to purchasers which would in turn lower the level of scienter required, as set out in the preceding paragraph. It is the law of the Second Circuit, highly regarded in the area of securities law, that "in the absence of direct participation in a securities violation, an outside director of a corporation has no duty to disclose adverse material facts or information to those prospective purchasers." *In re Union Carbide,* 666 F.Supp. at 561, citing to circuit precedent in *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1289 (2nd Cir.1973) (en banc); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2nd Cir.1982); *Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242 (2nd Cir.1987) (officers and directors of partnership not liable for misrepresentations in offering issued by partnership the preparation of which they had no part in).

■■ Under these rules, then, we see that plaintiffs cannot rely on legal constructs by which the non-Carlo individual defendants may be held. Plaintiffs have the burden of actually proving that the assistance was given with knowledge of the primary violations and the intent to

---

**18.** Plaintiffs have conceded on the record that the liability of the financiers and financing corporations, if at all, is on an aiding and abetting theory.

bring about their completion. We start by noting that there is absolutely no evidence, no smoking gun, to link Colón Nevares, Martínez Almodóvar, Martínez Echevarría or any of the other natural person defendants involved in financing, with knowledge of the fraudulent land sales campaign.[19] None of the many witnesses testified that those persons were ever told about how the land would be marketed, or about the actual suitability of the land for development, or about the kind of promises that would be made along with sales. No memos, letters or documents evidence that the fraudulent nature of the sales was disclosed to the individual participants. Instead, the record shows that the deal was a relatively minor one for the financiers. They took little interest in the project itself, and attended a few meetings on the matter and no more. It became clear from the testimony that Colón Nevares' interest was to do all in his power to leverage for himself and the other investors as much from JC Investments as possible, and to play on the financial vulnerability of JC Investments to extract very favorable terms for the financiers. That, however, only evidences an extremely aggressive business dealings manner, it has nothing to do with knowledge on the part of the financiers as to the manner in which the land was being marketed. Of course, participation in and knowledge of a fraudulent scheme can be proved by purely circumstantial evidence, *United States v. Cincotta,* 689 F.2d 238 (1st Cir.1982), but the evidence must be more than mere conjecture. In *Cincotta,* the court held that a jury could have found sufficient evidence to convict the president of a corporation for fraudulent acts of the corporation on evidence that no major decisions in the corporation were ever made without his direct input, along with proof that the decisions leading to the corporate fraud could only have been the result of major corporate decision making. Hence, the court reasoned, there was a significant basis for a

fact-finder to conclude that the president indeed knew about the fraudulent acts.

After watching all the evidence in this case carefully, this court cannot in good conscience believe that any reasonable fact-finder could support a decision that Colón Nevares, Martínez Almodóvar Martínez Echevarría or any of the non-Carlo individual defendants knew of the predicate acts and offered their assistance to further those acts. Even the proof that they were corporate directors of JC Investments during the first two years of sales, the circumstantial evidence most damning to them, shows only that they held the title, but had little or no connection to actual operations. For us to allow a verdict to issue against these individuals on this evidence would be to hold them in a constructive knowledge theory *solely* for their holding the position of director, an imputation clearly rejected by the precedent cited above.

If there can be no knowledge attributed to either Colón Nevares, Martínez Almodóvar or Martínez Echevarría, then neither Banco Economías nor Empresa Financiera can derive any aiding and abetting *respondeat superior* liability. *See Ashland Oil Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989) (*respondeat superior* liability may lie to hold corporation liable under RICO where employee acts on behalf of corporation, with authority, and in the corporation's interest, so long as the corporation held liable on the theory is not also the enterprise, since *respondeat superior* liability in that context would circumvent the "distinct identity" rule); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987); *Gruber v. Prudential–Bache Securities Inc.,* 679 F.Supp. 165 (D.Conn.1987).

In addition to trying to impute knowledge and therefore willing participation as an aider and abettor through Colón Nevares and Martínez Almodóvar, plaintiffs also point to the fact that in March of 1978 Mr. Edwin Vélez, Real Estate Manager of Banco Central, was in-

---

**19.** We note that as to non-financing defendants other than the Carlo brothers, there was no evidence on the record to link them to securities fraud activity on any theory. These individuals are Jorge Palacios, one of the original incorporators of JC Investments, Vincent Nuncio, JC Investments' lawyer, and Hal Wagner, JC Investments' mortgagee.

formed of the allegations of fraud by Mr. Dail, from the Florida Land Sales Board. Even if we assume that this was knowledge on the part of Banco Central that a fraud had occurred, plaintiffs still fail to prove willing participation in the fraudulent sale of securities, because the bank completely stopped making loans for land sales, even mere refinancings, in February of 1978. Therefore, even if the bank became aware in March of 1978 that a fraud had been committed, they failed to "participate" in any activity past that date which could be construed as a predicate act. We reject plaintiffs' theory that somehow continuing to collect on the personal loans which had already been made is "aiding and abetting" in the fraudulent sale of a security. The Supreme Court has restricted liability under the securities laws to misrepresentations connected with the *actual purchase or sale* of a security, with the emphasis being on the fraudulent inducement which caused the seller or purchaser to act. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The RICO language in Section 1961(1)(D), "fraud in the sale of securities," has been read by some courts to be even more restrictive that the "in connection with" language upon which the securities laws themselves rest, opening the possibility that any flexibility which might be read into the securities laws is lost where the security violation is being used as a RICO predicate act. *In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F.Supp. 668 (S.D.N.Y.1990).

Whatever exact scope of RICO based on securities law violations, it is not broad enough to brand the accepting of payments on a note used to purchase land as separate predicate acts, nor as aiding and abetting of the original sale giving rise to the payments. *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir.1988) (each payment on a note is not a separate sale for purpose of securities fraud). The predicate act, and the act which an aider and abettor must aid and abet, is the fraudulent misrepresentation which draws people to buy the sham security in the first place. While continuing to collect on loans which a lender later learns were taken out to buy fraudulently-marketed land may be risky business, from a public relations standpoint, and perhaps give rise to other forms of liability depending on the relationships of the parties, it is not aiding and abetting a securities law violation. That violation, and any aiding and abetting of it, ended at the point that the person entered a contract to purchase the security. Therefore, plaintiffs' proof that Banco Central found out in March 1978 that the loans they held were financing land sales which were fraudulent securities law transactions, and continued to collect on those loans, has no effect on the issue of whether Banco Central aided and abetted in those prior, fraudulent misrepresentations.

### *Successor Liability*

As a final matter we note that even if Banco Economías were found to be an aider and abettor and therefore a RICO violator, we disagree with plaintiffs that the liability could flow to Banco Central Corp., on a successor liability theory. Successor liability is generally described in the following fashion:

> Where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

15 Fletcher Cyclopedia of the Law of Private Corporations § 7122 at 190 n. 1 (perm. ed. 1983). It is usually employed in the context of products line tort liability. *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974); Note, *Recognizing Products Liability Claims at Dissolution: The Compatibility of Corporate and Tort Law Principles*, 87 Colum.L.Rev. 1048 (1987). Although we acknowledge that even criminal liability sometimes flows to a successor

corporation, *United States v. Shields Rubber Corp.*, 732 F.Supp. 569 (W.D.Pa.1989), and that at least one reported case of RICO successor liability exists, *Continental Grain Co. v. Pullman Standard, Inc.*, 690 F.Supp. 628 (N.D.Ill.1988), we think such successor liability should be found only sparingly and in extreme cases due to the requirement that RICO liability only attaches to knowing affirmatively willing participants. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34 (1st Cir.1991).

First, we find that the contract of sale of the bank did not obligate Banco Central Corp. to be liable for unknown contingent liabilities such as the ones alleged here. As plaintiffs point out, the contract between Banco Central, S.A. and Banco Economías, by which Banco Central Corp. was created, states that

> [t]he NEW BANK [Banco Central Corp.] shall purchase and acquire, for a total or lump sum, and Economías shall sell, assign and transfer to the NEW BANK, all of the assets, real or personal property, credits and rights, including cash on hand and in banks, which form a part of the estate ("patrimonio") of Economías, after the sale to FDIC of the assets detailed in EXHIBIT 5 of this agreement, and the NEW BANK likewise shall assume all liabilities, debts and obligations which form a part of the estate ("patrimonio") or Economías, which the exception of the capital notes issued by Economías.

. . . . .

> The NEW BANK shall have no obligation whatsoever as to the assets and liabilities of Economías not acquired or assumed pursuant to this Agreement. By way of antecedent ("Con carácter de antecedente"), the financial statement of

Economías as of March 31, 1977 is made a part hereof.

We read this second paragraph to clearly state that the acquiring bank was acquiring debts only to the extent that they were set out in the March 31, 1977 statement.[20] The bank was acquiring the face value of the liabilities, not latent, unknown lawsuits based on the quasi-criminal activity on the part of employees of its predecessors.

We also cannot accept the theory that Banco Central Corp. is merely a continuation of the selling corporation. Although it is true that the bank continued to operate at the same locations and with basically the same staff (one of the conditions for purchase was that the vast majority of the employees would be kept on), major changes were made at the highest levels which do not make the second bank a mere continuation of the first. The board of directors was changed, Colón Nevares left and was replaced by Campos as President, and perhaps most significantly, the policies of the bank changed. The sale was effectuated precisely to bail out the bank after years of mismanagement. Immediately after the sale Campos put out the word that the bank was getting out of the personal loan business, at least to a large extent. This was not merely a shift in corporate name, but was a fundamental restructuring overseen by both federal and Puerto Rico agencies in order to rework the bank so that it would not fail.

Even if the transaction could be seen to fall technically within the rubric of a "continuation", we would not apply that theory in this case. The sale of a bank brokered by the FDIC to avoid closure requires the transaction to be conducted with lightening speed and utmost secrecy in order to avoid panic and a so-called "run" on

---

**20.** The March 31, 1977 statement must be seen in light of the combined FDIC/Treasury Department Audit and Report of Examination of October 18, 1986, Defendants' Exhibit 106. This audit was Exhibit 5 to the agreement. There, the JC Investments personal loan portfolio which Banco Central bought is described at page 3–a–29 and was accorded a substandard classification. We have combed through the report as if we were actually buying the bank, trying to find red flags of any other JC Investments-related problems. The only other item we could find was that as part of the contingent liabilities listed there was a contingent liability of $30,000 of one Antonio Martínez Sánchez, not a plaintiff to this action. This person apparently had sued Banco Economías claiming that the bank misrepresented certain information in connection with a Florida land sale. *See* Report of Examination, p. 2–a–6.

the bank. While successor liability might be appropriate in "normal" transactions involving the purchases of corporations, it must be assumed that the purchaser has the time to conduct a due diligence investigation of the company to be purchased along with a careful investigation of lurking liability. The testimony in this case clearly established that the transaction happened so fast, and indeed had to happen so fast, that there was no time to conduct the kind of inquiry which might uncover this sort of problem. We would be loathe to hold an innocent corporation liable for acts of others which they not only did not know of at the time of acquisition, but could not possibly have been expected to find out about. Therefore, we would carve out an exception to successor liability for hidden RICO liabilities at least where the purchase is that of a bank and the deal is brokered by the FDIC. Without such an exception, the ability of the government to protect the depositors and the banking market in general may be greatly inhibited. Of course, if there is a showing of knowledge, constructive or actual, by the purchaser at the time of the transaction, the equation is altered and liability might lie. Here there was no such showing. In finding that FDIC brokered sales of banks would not open the purchaser bank up to RICO liability for acts of the predecessor, we are specifically not applying the so-called *D'Oench Duhme* rule. *D'Oench Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *Federal Deposit Ins. Corp. v. P.L.M. International, Inc.*, 834 F.2d 248, 252 (1st Cir.1987). The rule protects the FDIC, having acquired the assets of a bank, from being subject to secret agreements that do not show up on the bank's books. The rule has been extended to banks which are assignees of assets which were originally held by the FDIC. The protection that the FDIC had flows to banks to whom the FDIC chooses to transfer the assets it has held. *Federal Deposit Ins. Corp. v. Newhart*, 892 F.2d 47 (8th Cir.1989). In all such situations, at one time or another the FDIC is the actual holder of the assets in question. In the case at bar the FDIC never held the assets, and we cannot see that the doctrine should be extended to formally include FDIC *brokered* deals between banks. We think the second bank can be properly protected without a resort to such an expansion of the *D'Oench* rule under the circumstances of this case. Therefore, even if liability flowed as far as Banco Economías, Banco Central Corp. would still be insulated from liability, and need not answer the charges leveled against it here.

### Conclusion

There can be no pleasure in seeing these plaintiffs, undoubtedly wronged in some manner, leave this court with no redress. There may seem to be no justice in allowing the Carlo brothers, sellers of swampland to trusting buyers, to walk from this court without so much as a scratch. But our duty is to try cases under the statutes or doctrines which are actually and properly before us, not to twist and bend the process so that a judgment may issue on a theory long since lost, abandoned or never pled. Under the applicable law, no reasonable jury could find that the land sales contracts here amounted to "securities". At most, plaintiffs have proven a sale of lots through sales contracts obligating the seller to do no more than convey title. They have proven, or so a jury could find, that in addition to the written contract, an oral promise was made that standard residential improvements would be provided. They have proven a generalized marketing pitch about schools and stores and tennis courts. This proof is insufficient, as a matter of law, to satisfy the horizontal commonality test which must be applied to land sales contracts. The motion for a directed verdict is GRANTED as to all defendants, and the matter is DISMISSED.

IT IS SO ORDERED.

### Appendix A

### OPINION AND ORDER

Filed January 26, 1990

Various defendants seek dismissal of plaintiffs' amended complaint, which was

filed on December 18, 1989. Before we rule on their motions, a brief discussion of the recent history of this protracted litigation is in order.

## I.

On November 27, 1989, this court entered an opinion and order ("Opinion") in response to defendants' motions for summary judgment.[1] In this Opinion, the court dismissed as time-barred all plaintiffs' claims under the Land Sales Act and the Security Exchange Act. As for the civil RICO claims, the court concluded that the complaint failed to state a cause of action for a violation of 18 U.S.C. section 1962(a) for the reason that the damages alleged were not caused by the use or investment of racketeering-related income. Opinion at 26–28 [727 F.Supp. at 770–771]; *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149–50 (10th Cir.1989) (and cases cited therein). Thus, the claim under 18 U.S.C. section 1962(a) was also dismissed.

Although the 1962(a) claim was found deficient, a study of the allegations and voluminous evidentiary filings in this case revealed the probability that plaintiffs could state a valid claim under 18 U.S.C. section 1962(*c*). Thus, in the interest of justice, the court granted plaintiffs the opportunity to amend their complaint so as to plead a cause of action under this latter section. The court also noted that in order to state a claim under section 1962(c), plaintiffs would have to re-plead the "enterprise" element in accordance with the law of this circuit, which requires that the "person" and "enterprise" be different entities. Opinion at 29–31 [727 F.Supp. at 771–772]; *Odishelidze v. Aetna Life and Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir.1987); *Schofield v. First Community Corp. of Boston*, 793 F.2d 28 (1st Cir.1986).

In addition to the above, and in the interest of judicial economy, the court also ad-

dressed arguments raised by defendants that, if successful, would render even a properly amended complaint futile. In particular, the court examined a) whether plaintiffs had demonstrated a "pattern of racketeering activity;" b) whether there was sufficient nexus between the financier's involvement with the alleged fraud to support a claim for their liability; and c) whether the civil RICO claim was time-barred. Each of these defenses was raised and thoroughly briefed by defendants in their attack on the 1962(a) claim, but each defense is also equally applicable to claims under section 1962(c). Thus, the court found it beneficial to the efficient resolution of this case to rule upon these matters as well, deciding each issue against the defendants while noting in many instances a substantial ground for a difference of opinion as to underlying questions of law.

Because some of the legal issues were close ones, we concluded the Opinion by certifying five questions for interlocutory appeal. Shortly after the Opinion was issued, however, the defendants filed a motion arguing, correctly we think, that because the continued vitality of this case was subject to plaintiffs' amendment of their complaint, and because plaintiffs had not yet done so, the issues concerning civil RICO were not yet ripe for interlocutory appeal. We agreed, and thus set a time limit for plaintiffs to amend. In addition, the court also set a time limit for defendants to file any new dispositive motions against the newly amended complaint and specifically against a section 1962(c) cause of action. However, the court encouraged defendants not to re-plow old ground by again arguing the defenses that were already briefed by the parties and ruled upon in the Opinion.

It was in this posture that plaintiffs in fact submitted their amended complaint on December 18, 1989, and that several defendants subsequently filed motions seeking dismissal the same. We now turn to the substance of these motions.

---

1. The reader is referred to the text of the Opinion for a more complete discussion of the background of this case.

## II.

The central theme of defendants' motions is that the newly amended complaint fails to plead the predicate acts—in this case, securities fraud and mail fraud—in accordance with Fed.R.Civ.P. 9(b). As a general matter, in an action with fraud at its center, Rule 9 "requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980). In *New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir.1987), the First Circuit held that Rule 9(b) applies to the predicate acts underlying a civil RICO claim.[2] Moreover, the purposes behind Rule 9(b) were found to be threefold:

> (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit"; and (3) to safeguard defendants from frivolous charges which might damage their reputations.

*Id.* at 289.

The newly amended complaint, like the original complaint, indisputably outlines the alleged fraudulent scheme—namely, that certain defendants fraudulently induced plaintiffs to purchase and make payments on land contracts, and that other defendants aided and abetted in the same by, among other things, financing purchases known to be fraudulently induced, concealing the fraud, approving false advertisements, and, in one case, allowing its name to be held out as backer of the Sunrise Project. The content of the alleged misrepresentations is stated to involve the quality, value and fitness of the land sold, as well as false promises to develop it. The vehicles for these misrepresentations are alleged to be advertisements, solicitations, mis-translated disclosure documents and oral and written statements from representatives and salespersons.

It is true, as defendants argue, that the complaint does not always specify the exact date each misrepresentation was made, nor from exactly whose lips or pen it emerged. We do not, however, think that the circumstances of this case warrant that kind of specificity. *See In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597 (N.D.Ill.1987) (less specificity required when allegedly fraudulent transactions are numerous and take place over extended period to time). Furthermore, any vagueness in the "time, place or content" of the pleaded misrepresentations is cured by an examination of the voluminous filings in this case: the written advertisements and statements are contained in the record, and the deposition transcripts contain responses by plaintiffs as to who gave them verbal assurances. Likewise, the purchase contracts of are included in the docket.

In short, we cannot conclude that the amended complaint, when read in conjunction with these filings, fails to put defendants on notice of the case against them or of the details of the alleged fraudulent scheme.[3] Therefore, given the lengthy history and posture of this case,[4] we hold that the predicate acts of securities fraud have been pleaded with sufficient particularity.

With respect to the allegations of mail fraud, however, different considerations hold sway. Unlike the securities fraud allegations, mail fraud under 18 U.S.C. section 1341 was pleaded for the first time in the newly amended complaint. While this

---

**2.** While *Becher* specifically dealt predicate acts of mail and wire fraud, the court announced, with respect to Rule 9(b), the "degree of specificity is no more nor less than we have required in general fraud and securities fraud cases." *Id.* at 290.

**3.** We note, for instance, that the co-defendant financiers need only look to this court's Opinion at 35–39 [727 F.Supp. at 774–776] to be on notice of the proffered basis for their liability as aiders and abettors of the fraud. The incidents forming this basis were, of course, gathered from documents of record submitted by the plaintiffs and of which the defendants are well aware.

**4.** We offer no opinion as to whether the pleading would suffice were it read *in vacuo*.

 court has been generous in allowing plaintiffs to amend their pleadings to state a civil RICO cause of action, we think it is too late in the day to bring in new predicate acts. Defendants did not attack the mail fraud claim in their past motions for summary judgment, presumably because this allegation was not then in the case. To allow these new allegations now would necessitate another round of dispositive motions and discovery.[5] We are unwilling, after seven years of litigation, to endorse what promises to be a *Bleak House* scenario. While certain mailed documents and correspondence already in the record may of course evidence fraud in connection with the sale of securities, the court is unwilling to recognize mail fraud *per se* as a new predicate act, or consider the legal consequences of doing so. The predicate act of mail fraud is thus removed from the amended complaint.

### III.

Defendants also argue that the third amended complaint again fails to properly allege the enterprise element. In the Opinion we pointed out that under section 1962(c) the "person" who engages in a pattern of racketeering activity—i.e. the defendant—must be distinct from the "enterprise" affecting interstate commerce; under subsection 1962(c) the "enterprise" itself is not liable. Opinion at 29 [727 F.Supp. at 771]; *Odishelidze v. Aetna Life and Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir.1987); *Schofield v. First Commodity Corp. of Boston*,

793 F.2d 28 (1st Cir.1986). Finding the enterprise element deficient in the previous complaint, the court determined that this part of the cause of action would have to be re-pleaded.

Plaintiffs have now alleged that the enterprise consists of an "association in fact" of the various defendants involved in the promotion and sale of the Sunrise Projects.[6] *See* 18 U.S.C. § 1961(4). As mentioned in our Opinion, we think this amendment is sufficient to cure any problems arising due to the enterprise/person distinction. Opinion at 29–31 [727 F.Supp. at 771–772]; *see also Beauford v. Helmsley*, 865 F.2d 1386 (2nd Cir.1989) (*en banc*). Moreover, as to any requirement that the association of fact be an ongoing unit, we believe that plaintiffs have clearly "presented sufficient evidence to give rise to a factual dispute regarding the continuity and hence the enterprise status of the association" among the defendants. *Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 749 (5th Cir.1989).

### IV.

In light of the above, defendants' motions to dismiss the new complaint are DENIED. At this time, the court renews its certification for interlocutory appeal of the questions raised in its November 27, 1989 Opinion. *See* Opinion at 47–49 [727 F.Supp. at 779–780]. The court particularly urges the circuit to address the question of when a civil RICO cause of action accrues for statute of limitation purposes. *See* Opinion at 40–47 [727 F.Supp. at 776–779]. This is a pure question of law of

---

**5.** Defendants make this argument less convincingly in the context of our allowing a "new" action under 1962(c). In short, defendants argue that prior to our November 27, 1989 Opinion, all their discovery and dispositive motions were geared toward defending against a claim under 1962(*a*) and that a "newly" pleaded claim under section 1962(*c*) would require a whole new round of filings. We disagree. As stated above, many of the arguments levied against the 1962(a) claim were equally applicable to claims brought for a violation of 1962(c) and were addressed in the court's Opinion. In our Order of December 12, 1989, we gave defendants the opportunity to raise any *new* legal arguments against a 1962(c) claim, and with the exception

of the "enterprise-person" distinction, none were raised.

**6.** This is the obvious intention to be gathered from the complaint, although plaintiffs' actual wording, here and elsewhere, is less than graceful. At page seven of the amended complaint plaintiffs refer to "an association of persons in fact constituting a separate enterprise," which is dubbed "J.C. Enterprise." At page twelve, plaintiffs mention "the enterprises consisting of associations in fact among the various defendants in the Sunrise Projects." In the alternative, plaintiffs also name one of the defendants, J.C. Investments, Inc., as the enterprise.

great importance and one that has given rise to thoughtful disagreement. *Compare: Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988) and *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125 (3rd Cir. 1988). A ruling contrary to the one reached by this court would in all likelihood result in dismissal with regard to the vast majority of the plaintiffs. *Any* ruling on this issue would promote the expedient conclusion of this litigation and save the court and the parties substantial time and expense.

Defendants are on notice that they have ten days from the entry of this order to apply for interlocutory appeal.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 25th day of January, 1990.

/s/ Jose Antonio Fuste
JOSE ANTONIO FUSTE
U.S. District Judge

APPENDIX B

ORDER

Filed April 18, 1991

This matter is going to trial. Five hundred and sixty-five docket entries have been filed, scores of depositions have been submitted, reams of dispositive motions have been handled, and nine years have passed since this case first came to life in 1982. This judge inherited the matter upon appointment to the bench in 1985 and, since then, our effort has been directed to placing this matter on the road to disposition. Throughout the litigation, this court has suffered through badly unorganized filings, a refusal or inability of counsel to identify and focus on the pertinent issues, and a repeated failure to comply with directives of this court through which we sought to impose order on the chaos. We have been extremely tolerant, but patience has its limits and ours is lost. Still, the controversy is here, and we will see it to

resolution. We move on to the immediate business at hand. The full lurid history can be culled from two published opinions, *Rodríguez v. Banco Central*, 917 F.2d 664 (1st Cir.1990), and *Rodríguez v. Banco Central*, 727 F.Supp. 759 (D.P.R.1989), and an unpublished opinion which can be found at Docket Document No. 535.

After we certified an interlocutory appeal, 28 U.S.C. § 1291(b), this case now comes to us on remand from the Circuit on the question of whether some of the plaintiffs' claims may be considered time-barred for purposes of summary disposition. The only remaining cause of action is the RICO cause, with securities law violations forming the predicate acts. We originally denied summary judgment to defendants on the limitations period, holding that the four-year limitations period, *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), began to run only after the *last* predicate act giving rise to liability. *Banco Central*, 727 F.Supp. at 777, *citing Keystone Ins. Co. v. Houghton*, 863 F.2d 1125 (3rd Cir.1988). There being substantial ground for difference of opinion, the First Circuit, on the interlocutory appeal, adopted the RICO accrual rule of the Second Circuit in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2nd Cir.1988), cert. denied 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989). The *Rhoades* court held that

each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury.

*Rhoades*, 859 F.2d at 1102, *cited in Banco Central*, 917 F.2d at 665–66. The relevant date, four years prior to the filing of the case, is August 2, 1978. Therefore, the Circuit remanded to us for a factual determination as to whether any plaintiffs knew or should have known about the fraudulent land sale which caused the injuries they allege on or before August 2, 1978.[1]

---

1. Since this is a RICO claim, presumably no statute of limitations could begin to run unless the particular plaintiff knew not only about his or her own injury, but also about at least one

other such predicate act. *See discussion, Banco Central*, 917 F.2d at 668. This presents no problem in this case since we must assume that any plaintiff who learned that the land sale was a

Towards this end we have engaged in a review of the voluminous material submitted by both parties on the issue of summary judgment, with special attention to those individuals who visited the subject land on or before the cutoff date.[2] Our review convinces us that defendants cannot show that on the basis of undisputed facts it can be said that the plaintiffs knew or should have known of their injuries before August 2, 1978. Few if any of those who visited were able to find their actual lots because the "keeper" who was living on the lands did not have any plot plans and the area was totally unmarked. Those who saw water on the land were often convinced not to worry since the plan that had been presented to them included the draining of land and the building of a lake which would solve the problem of flooding. Several who testified in deposition to visiting the land in 1978 could not be more specific, or were not asked by defendants' counsel *when* in 1978 they visited, making it impossible to determine whether the visit was on or before August 2, 1978. We review a sampling of the scenarios we encountered.

Miguel Cires Blanco went to the area twice in 1975 or 1976. A person who did not speak Spanish (Mr. Cires does not speak English) was there, but could only point generally to Mr. Cires' lot. It was a pretty area, and Mr. Cires was satisfied with the purchase. (Deposition, p. 21).

Miguel A. Palacios went to the property in 1977. He saw flooded land in the area, but he was unable to locate Sunrise Acres, and was not sure he was in the right place. At any rate, he did not think anything was unusual, since he figured that they had simply not yet begun to construct the roads. (Deposition, p. 64).

Luis F. Suárez visited the land, and could not get in to see the lots because of a fence, but he saw a tractor. Although he had some doubts, he felt safe, because the bank (Banco Economías) was involved in the project. (Deposition p. 17).

While some plaintiffs have testimony indicating slightly more actual or constructive knowledge than this sampling, others have even less. On the whole we find that summary disposition would be inappropriate. Any defense based on the limitations period will still be available to defendants as proof comes out at the trial. Since we will be trying the bulk of the plaintiffs in this case in any event, preservation of judicial resources militates in the direction of allowing the few marginal cases on the issue of knowledge go to trial, rather than having to revisit the same ground twice. The motion for summary judgment is therefore DENIED. Defendants' recent motion for an extension of time to file further deposition testimony in support of the motion for summary judgment as to plaintiffs about whom defendants did not file originally is also DENIED.

The parties will meet and prepare a joint proposed pre-trial order which will include a current list of all remaining plaintiffs. The list will be in the following format. The plaintiffs will be arranged in alphabetical order, and each plaintiff will occupy one line and be assigned a separate number. Two blank lines will be left between each plaintiff. Deceased plaintiffs who have already been formally substituted by their heirs will be identified as such, and all heirs will be listed as a group, under the name of the deceased. The entire group of heirs will be assigned one number only. Where a husband and wife own a lot together, they will be assigned one number. An example follows:

1. Teresita Abella and Alfredo Caro

---

scam, knew or should have known the slick sales materials were also used to induce others to buy. It *would not take an FBI agent to* determine that a whole fraudulent sales company was not set up to sell one $5,000 lot.

**2.** Defendants tried to impute constructive knowledge to plaintiffs on the basis of a Florida Public Offering statement which defendants allege plaintiffs were given to read, and which

contains statements which caution that the land was not a "homesite offering" and that neither defendants nor the government were under any obligation to develop the area. We have already held in our previous decision, for reasons set out therein, that questions of fact surrounded the issue which would preclude summary disposition on that basis. *Banco Central*, 727 F.Supp. at 769.

2. Eddie Aguilú Emmanuelli and Carmen Alicia Semidey Rolón

3. Estate of Rafael Antongiorgi, Heirs: Miguel Angel, Luis Antonio, Maria Justina.

Each side will submit a theory of the case. Particular attention should be paid to the issue of the liability of the financiers and the status of the sale of these lots as securities. We see many areas in this case in which stipulated facts may be useful. In particular, we expect the parties to stipulate to the amount paid by each plaintiff, the basic financing structure of the sale, and the many exhibits the admissibility of which should be unquestioned. Failure by any attorney to accede to stipulation requests which do not directly conflict with that attorney's duty of rigorous representation of his or her client will be viewed with great displeasure by the court.

We also strongly encourage parties to explore the possibility of settlement. We remind defendants of the potential for treble damages, and the effect that much of the proof we have seen proffered to date will have on a jury. We remind plaintiffs of the logistical difficulty of presenting proof on so many claims, and the legal obstacles which, while not yet fatal on summary judgment, may prove so later.

The Pretrial conference is set for July 1, 1991, at 4:00 P.M. Trial will begin on August 5, 1991, at 9:30 A.M. A proposed pre-trial order including stipulated facts will be submitted on or before May 27, 1991.

We will entertain no further filings of dispositive motions, addendums to any such motions already filed, nor discovery requests.

The parties will file a Proposed Pretrial Order which will be the product of their joint work. Counsel are directed to meet prior to the date of the pretrial to discuss, not only the contents of the Proposed Pretrial Order, but also the possibility of the extrajudicial determination of the action. If settlement cannot be agreed to, the parties will treat during said meeting the designation and marking of exhibits and depositions, as well as the proposed voir dire and jury instructions in the event that the matter is to be tried before a jury.

The Proposed Pretrial Order shall contain the complete caption of the case and shall set forth the following:

## I.

### NATURE OF THE CASE

The parties should attempt to agree on the description to be given under the title "Nature of the Case". Issues of jurisdiction shall be included herein. In the event that the parties cannot agree on the content under this subsection, each party should give its version of the nature of the case duly identified as plaintiff's statement of the nature of the case, defendant's statement of the nature of the case, etc.

## II.

### THEORY OF THE PARTIES

Each party will be identified fully and its theory of the case, including citations of statutes and/or case law, when applicable, will be given. In this respect, be mindful of *Erff v. Markhon Industries, Inc.*, 781 F.2d 613, 617 (7th Cir.1986), and *Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782, 786–87 (1st Cir.1974). *See also Awilda Ramirez Pomales v. Becton Dickinson & Co., S.A.*, 839 F.2d 1, 3–6 (1st Cir.1988). Attorneys at the pretrial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be, inasmuch as the pretrial order may supersede the pleadings in establishing the issues to be considered at trial.

## III.

### THE ADMITTED FACTS

The parties are directed to fully stipulate all matters which can be the object of admission and/or stipulation. Whenever it is appropriate, a reference to documents which will be submitted in evidence shall be made in each particular stipulation and/or factual admission.

## IV.

### THE ULTIMATE FACTS WHICH WILL BE DISPUTED

The parties should attempt to agree on which will be the ultimate facts to be disputed. In the event that they cannot reach said agreement, each party should designate what, in its opinion, are the ultimate facts which the Court will have to pass upon to resolve the controversy.

## V.

### LIST OF EXHIBITS AND TRANSLATION OF SAME

Not later than three (3) working days before the date scheduled for the trial, the parties will meet, after having requested the appropriate appointment, with the Courtroom Deputy Clerk assigned to the presiding judge to mark those pieces of documentary and/or real evidence which will be admitted into evidence, as well as those pieces of documentary and/or real evidence over which there is objection, in which case they will be marked as documents for identification.

In this respect, the parties are warned that this process cannot be pro forma. If at trial the presiding judge becomes aware of the fact that the parties did not engage in a meaningful marking of exhibits' process in light of the Federal Rules of Evidence, appropriate sanctions will be taken against counsel. *See* Fed.R.Civ.P. 1 and 28 U.S.C. § 1927.

The Proposed Pretrial Order, under the heading "List of Exhibits and Translation of Same", shall include a list of the exhibits of each party numbered and/or marked in the same fashion as they will be delivered to the Clerk, with an indication as to which are being admitted without objection by opposing counsel.

The parties are aware of the fact that the proceedings in this court are held in English. That means that particular attention should be given to the Clerk's Notice to Counsel 90–4, dated April 20, 1990, on the subject of translations and interpreters.

Members of the bar are reminded of the provisions of Local Rule 108 which, in essence, do not allow for the filing of documents in Spanish unless duly translated by court interpreters.

## VI.

### DEPOSITIONS

The parties will list each deposition intended to be used at trial, with designation of portions to be used by the party first offering the same. Objections to the use of depositions or to any designated portion not made at the time of the preparation of the Proposed Pretrial Order will be deemed waived.

## VII.

### THE POINTS OF LAW TO BE PASSED UPON BY THE COURT

As in other items which could be the object of agreement, the parties are directed to attempt to agree on points of law to be passed upon by the Court. In the event that this is not possible, each party shall state what, in its opinion, are the points of law to be passed upon by the Court. Adequate citations to statutes and/or case law should be given when appropriate.

## VIII.

### PROPOSED VOIR DIRE AND JURY INSTRUCTIONS

The Proposed Pretrial Order shall incorporate the parties' agreement as to proposed voir dire and proposed jury instructions, both general and specific, related to the particular case in issue. There is no need to propose routinary instructions, often referred to as boilerplate instructions. In the event that the parties cannot agree on this subject, each party shall make a part of the Proposed Pretrial Order, under item VIII, its proposed voir dire questions to the jury and all suggested standard or general instructions, as well as specific instructions to be given to the jury. The parties are advised that the Court prefers references to Devitt & Blackmar, *Federal Jury Practice and Instructions,* and/or

*Pattern Jury Instructions,* 5th, 7th, 9th, and 11th Circuits, and/or Federal Judicial Center Publications.

## IX.

### TECHNICAL WORDS

A list, in alphabetical order, of technical words that could be used during the trial, must be made a part of the Proposed Pretrial Order. This request is for the benefit of court personnel, specifically the court reporter and the court interpreter.

## X.

### WITNESSES

The Proposed Pretrial Order shall contain a list of the potential witnesses to be called by each party, with a brief description of the purpose and/or content of their testimony.

## XI.

### EXPERT WITNESSES

In the event that expert witnesses are to be utilized by the parties, the Proposed Pretrial Order shall contain written stipulations or statements setting forth the qualifications of the expert witnesses to be called by each party. A brief description of the purpose of the expert testimony will be given as it pertains to each expert witness. The parties should be aware of the fact that Fed.R.Evid. 706 allows the Court to appoint experts on its own motion and/or on motion of any party.

## XII.

### ITEMIZED STATEMENT OF SPECIAL DAMAGES

In the event that issues of special damages are to be passed upon at trial, an itemized statement of special damages shall be incorporated into the Proposed Pretrial Order. The party or parties not in agreement with the proposed statement of special damages shall include the reasons in opposition under this part of the Proposed Pretrial Order.

## XIII.

### ESTIMATED LENGTH OF TRIAL

The parties will make an estimate of the probable length of trial.

### RESERVATIONS

1. Unless otherwise disposed of by the Court, each party is limited to a maximum of three (3) expert witnesses. The Court reserves to each party the right to offer rebuttal testimony at trial if necessary. The Court also reserves to each party the right to further supplement the list of witnesses upon application to the Court and for good cause shown.

2. The Proposed Pretrial Order may only be modified to prevent manifest injustice. Such modification may be made either on application of counsel for the parties or on motion of the Court.

3. The parties are reserved the right to supplement their request for jury instructions during trial as it pertains to matters that could not be reasonably anticipated.

4. The Proposed Pretrial Order shall contain the full caption of the case, making reference to appropriate name of each party to the controversy as the same stands for trial purposes.

5. The Proposed Pretrial Order shall be filed at least three (3) days before the date scheduled for the Pretrial Conference.

6. At the time of pretrial, the parties should be prepared to discuss the possibility of bifurcating liability from damages. This applies both to bench and jury trials. The parties are also instructed to prepare and file with their Proposed Pretrial Order their proposed findings of fact and conclusions of law. This applies to bench trials.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 18th day of April, 1991.

/s/ Jose Antonio Fuste
JOSE ANTONIO FUSTE
U.S. District Judge

## APPENDIX C

**J. C. INVESTMENTS, INC.**
An unimproved acreage Offering
Ofrecimiento de Terrenos sin Mejoras

**PURCHASE AGREEMENT**

Articles of agreement between J. C. Investments, Inc., a Florida corporation (SELLER), and

Nombre (Name) _____ Amelia Cabilla Martinez _____

Dirección (Address) _____ Calle 8 #1295, Urb. Montecarlo _____

Ciudad (City) _____ Rio Piedras, P. R. _____

(BUYER), who agrees to purchase the following described property·

**SUNRISE ACRES**
Polk County, Florida

**CONTRATO DE VENTA** 3895

Acuerdo entre J C Investments, Inc, corporación del estado de Florida denominada de ahora en adelante como el VENDEDOR y

COMPRADOR, quien acuerda comprar la propiedad descrita a continuación

### SEE LEGAL DESCRIPTION ATTACHED
### LOT D-44

More or less subject to survey; less easements for right of way. Subject to oil, gas and mineral rights and other Restrictions of Record.
The purchase shall be on the following terms and conditions.

Sujeta a una mensura. Sujeta a reserva para servidumbre de y sujeta a cualquier derecho sobre petróleo, gas y otros depósitos minerales y sujeta a otras Restricciones de Registro.
La compra se efectuará de acuerdo a los siguientes términos y condiciones·

| 1. Cash Price / Precio en Efectivo | 2. Cash Down Payment / Pronto pago en Efectivo | 3. Unpaid balance (Amount financed) / Bal. no pagado de precio en efectivo (Cantidad financia) | 4. Finance Charge / Cargo de Financia-miento | 5. Total of payments / Total de pagos | 6. Deferred Payment price (Item 1 – 4) Balance diferido a pagar (Columna 1 – 4) |
|---|---|---|---|---|---|
| $15,000.00 | $3,600.00 | $11,400.00 | $9,816.00 | $21,216.00 | $24,816.00 |

| 7. Amount of Monthly Payment / Pago mensual | 8. Total number of monthly Payments / Número de Plazos mensuales | 9. Final payment / Pago Final | 10. Annual Percentage Rate / Tipo de Interes anual | 11. First payment due / Fecha·ven-cimiento del primer plazo | 12. Finance charge Accrues Beginning / El cargo de financiamiento a acumularse desde |
|---|---|---|---|---|---|
| $88.40 | 240 | $88.40 | 7% | 8-30-75 (and on the 1y en el mismo same day of día de los me-each month 1ses subsiguien-thereafter 1tes) | 7-75 |

Seller retains title as a security interest (as defined by Federal Reserve Board Regulations Z) in property. Late charges of 3% of the monthly payment may be charged. :

"You have the option to void your contract or agreement by notice to the seller if you did not receive a Property Report prepared pursuant to the Rules and Regulations of the Office of Interstate Land Sales Registration, U.S. Department of Housing and Urban Development, in advance of, or at the time of your signing the contract or agreement. If you received the Property Report less than 48 hours prior to signing the contract or agreement you have the right to revoke the contract or agreement by notice to the seller until midnight of the third business day following the consummation of the transaction. A business day is any calendar day except Sunday, or the following business holidays: New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Veteran's Day, Columbus Day, Thanksgiving and Christmas."

**BUYER'S SIGNATURE TO THIS CONTRACT ACKNOWLEDGES THAT HE HAS RECEIVED A COPY OF THE FLORIDA PUBLIC OFFERING STATEMENT.**

**SUNRISE ACRES IS UNIMPROVED, UNSURVEYED ACREAGE WITHOUT PHYSICAL ACCESS TO EACH INDIVIDUAL TRACT, WITHOUT DRAINAGE OR OTHER IMPROVEMENTS. 35% IS MARSH OR SWAMPY AND IS SUBJECT TO FLOODING.**

In witness whereof the parties to these presents have hereunto set their hands and seals this _____ day of _____ 19___ .

El vendedor retiene el título de la propiedad constituyendo ello un gravamen sobre la misma ("security interest tal y como se define bajo el reglamento Z de la Junta de Reserva Federal). Podrán cobrarse cargos por demora equivalentes a un 3% del pago mensual.

Usted tendrá la opción de cancelar este contrato o acuerdo, notificando a la compañía vendedora si usted no recibió el reporte de la propiedad preparado y conforme a las reglamentos del Departamento de la Vivienda y Desarrollo Urbano de los Estados Unidos, antes o al momento de firmar su contrato o acuerdo. Si usted recibió el reporte de la propiedad antes de 48 horas de firmar el contrato·o acuerdo, usted tiene el derecho de revocar el contrato o acuerdo, notificado a la compañía vendedora hasta media noche del tercer día de negocio después de consumar la transacción. Un día de negocio es cualquier día del calendario con excepción del domingo o su día de negocio después de un día feriado como Año Nuevo, Cumpleaños de Washington, Día de Memorial, Día de la Independencia, Día de los Veteranos, Día de Columbus, Día de Acción de Gracias y Día de Navidad.

**LA A FIRMA DEL COMPRADOR EN ESTE CONTRATO AFIRMA QUE EL HA RECIBIDO UNA COPIA DEL CERTIFICADO DE OFRECIMIENTO PUBLICO DEL ESTADO DE LA FLORIDA.**

**SUNRISE ACRES ESTA SIN DESARROLLAR, SIN DESLINDE, SIN ACCESO FISICO A CADA UNO DE LOS LOTES INDIVIDUALES, SIN DRENAJE U OTRAS MEJORAS. UN 35% ES BAJO Y SUJETO A ANEGARSE.**

Y para que conste que las partes arriba descritas están de acuerdo con las cláusulas y condiciones enumeradas, firman este contrato hoy 29

de 7 , 19 75

TESTIGOS (WITNESSES)

_____ Amelia Cabuya Martinez _____
Comprador (Buyer)

_____
Vendedor (Seller)

State of
County of
The foregoing instrument was acknowledged before me by the officer/authorized agent of J.C. Investments, Inc. signing above on behalf of the corporation, this _____ day of _____ 19___ .

NOTARY PUBLIC

Mi comisión expira
My commission expires· Permanent
Este instrumento se preparó por·
This instrument prepared by

COMPRADOR (PURCHASER)
J. C. INVESTMENTS, INC.
Por· (By) _____
OFFICIAL (OFFICER)
Estado de (State of) COMMONWEALTH OF PUERTO RICO
Condado (County)
Afidavit SAN JUAN

Reconocido y suscrito ante mi por Don Ralph D. Carlo
mayor de edad, casado y vecino de Guaynabo
Puerto Rico en su capacidad de oficial y en representación de J. C. Investments, Inc. a quien doy fé de conocer personalmente en S.J. , Puerto Rico, este 7 día de _____ de 1975

NOTARIO PUBLICO

## FURTHER CONDITIONS OF SALES

**MAINTENANCE CHARGE:** Buyers and assigns agree to pay an annual maintenance charge for community facilities of $25.00 per year per lot, said charge to be billed, collected and administered by Seller.

**RESTRICTIONS:** Buyers are bound by Restrictions recorded in the Public Records of Polk County, Florida.

**ACCESS:** Legal access to each parcel in Sunrise Acres is provided by recorded easements and rights of way, however, no roadways exist in Sunrise Acres and none are contemplated by either Seller or Polk County, Florida.

**EXCHANGE PRIVILEGE:** This tract may be exchanged for another available tract of the same classification of equal price (as determined by the then current sales price); or traded in at the full purchase price or the then current sales price (whichever is the higher) towards the purchase of another available higher priced tract, at any time before Warranty Deed has been issued, or the Contract is recorded.

**TRANSFER OF INTEREST:** This contract and the rights and interests hereunder are not transferable by Buyer without written consent of Seller and then only upon the same terms and conditions herein contained, provided the contract shall not be in default. Seller reserves right to assess a transfer fee.

**TAXES:** The Company agrees to advance all property taxes levied against the property subject to its right to receive reimbursement from the purchaser for any taxes so advanced.

**NO PERSONAL LIABILITY:** Sellers may not bring suit or take judgment against Buyer for failure to make payment required by this agreement.

**DEFAULT AND TERMINATION:** If Buyer fails to make any payment when due, the Buyer shall be in default, and the Company may terminate this Agreement. Before termination for failure to make payments, Buyer shall have a grace period of: 60 days if 10% or less of the purchase price has been paid; 90 days if more than 10% but less than 25% of the purchase price has been paid; 120 days if more than 25% but less than 50% of the purchase price has been paid or 150 days if more than 50% of the purchase price has been paid. If Buyer does not bring his account to a current status within the grace period, the Company may terminate this Agreement. The parties acknowledge that, in the event of termination of this Agreement, as in this paragraph provided, it would be impractical or impossible to determine the exact nature and extent of damages which would accrue to the Company. Accordingly if the Company terminates this Agreement because of Buyer's default, the Company may keep all monies paid by Buyer under this Agreement as liquid damages to compensate it for having taken the property off the market and for its expenses of sale.

**30 DAY REFUND PRIVILEGE:** Buyer may within 30 days hereafter, request a refund of all monies paid on this Contract.

**COMMUNITY FACILITIES:** Community facilities will be maintained until 1980 or conveyance of same to a Property Owner's Association, when and if said association may be established by the Seller.

## CLAUSULAS Y CONDICIONES ADICIONALES DE ESTE CONTRATO DE COMPRA VENTA

**CARGOS DE MANTENIMIENTO:** Los compradores y sus cesionarios acuerdan pagar un cargo anual de $25.00 de mantenimiento por año por lote, dicho cargo será cobrado y administrado por el Vendedor.

**RESTRICCIONES:** Los compradores están obligados por restricciones inscritas en los Registros Públicos de Polk County, Florida.

**ACCESO:** Acceso legal a cada parcela en "Sunrise Acres" se ha provisto mediante el registro de servidumbres, sin embargo, no existen caminos a cada parcela en Sunrise Acres y no se contempla la construcción de caminos por parte de J. C. Investments, Inc. o el Gobierno del Condado de Polk.

**PRIVILEGIO DE PERMUTA:** En cualquier momento con anterioridad al otorgamiento de la Escritura de compra venta (warranty deed) o a la inscripción del contrato, esta propiedad puede ser permutada por otra disponible de la misma clasificación y de igual precio, (determinado el precio en base del valor actual del mercado al momento de la permuta), o permutada por otro lote disponible que haya sido valorado a un precio mayor aplicando en pago el valor total de compra de la propiedad permutada o al valor actual de venta de la misma, cual sea mayor.

**CESION DE DERECHO:** Este contrato y los derechos e intereses bajo el mismo no son transferibles por el comprador sin previo consentimiento escrito del vendedor y únicamente bajo los mismos términos y condiciones de este contrato, siempre que no exista incumplimiento bajo el mismo. El vendedor se reserva el derecho de cobrar un cargo por dicha cesión.

**IMPUESTOS:** El vendedor se compromete a pagar por venta y cargo del comprador cualesquiera impuestos que se impongan sobre la propiedad y el comprador se compromete a reembolsarle al vendedor las sumas pagadas por éste por concepto de dicho impuesto.

**RESPONSABILIDAD PERSONAL:** El Vendedor no puede demandar al Comprador por casos de morosidad en el pago de los plazos del contrato.

**INCUMPLIMIENTO Y RESOLUCION DEL CONTRATO:** Si el comprador no pagare cualquier plazo a su vencimiento ello constituirá un incumplimiento de los términos de este contrato que dará derecho a la compañía a dar por terminado y a resolver el mismo. Antes de resolver o dar por terminado un contrato por falta de pago, el comprador tendrá un período de gracia de: 60 días si 10% o menos del precio de compra ha sido pagado; 90 días si más del 10% pero menos del 25% del precio de compra ha sido pagado; 120 días si más del 25% pero menos del 50% del precio de compra ha sido pagado o 150 días si más del 50% del precio de compra ha sido pagado. Si el Comprador no paga los plazos vencidos y los recargos correspondientes, si alguno, dentro del período de gracia, el vendedor puede resolver o dar por terminado el contrato. Las partes acuerdan que en caso de tener que cancelarse este contrato por las razones señaladas en este párrafo será impráctico o imposible determinar la naturaleza y extensión de los daños que se le pueda haber causado a la compañía vendedora. Por lo tanto, si el vendedor resuelve dar por terminado este contrato debido al incumplimiento del comprador según aquí descrito, el vendedor retendrá todos los pagos que haya recibido del comprador como compensación por los daños sufridos por haber retirado del mercado la propiedad y por los gastos incurridos en la venta.

**PRIVILEGIO DE REEMBOLSO DENTRO DE 30 DIAS:** El comprador puede, dentro de 30 días después de firmarse este contrato pedir un reembolso de todo el dinero pagado bajo este contrato.

**FACILIDADES COMUNALES:** Las facilidades comunales serán mantenidas hasta el año 1980 o transferidas a una Asociación de Propietarios cuando y si dicha asociación fuera establecida por el vendedor.

1076

LEGAL DESCRIPTION AS FOLLOWS:

Parcel No. 44: From a point South 00° 43' 29" East, 640
feet, and North 89° 30' East, 4150 feet,
from the Northwest corner of Section 4,
Township 26 South, Range 25 East, Polk
County, Florida; run South 89° 30' West,
200.66 feet; run thence North 22° 36'
30" East, 100.19 feet; run thence North
04° 55' West, 457.29 feet, to the South
Line of State Highway No. S-54; run thence
Easterly along said Right of Way Line,
192.32 feet; run thence South 00° 43'
29" East, 530.23 feet, to the Point of
Beginning.

 IN WITNESS WHEREOF, the parties to these presents have hereunto set
their hands and seals that above legal description/descriptions are part
of this Purchase Agreement.

WITNESS: J. C. INVESTMENTS, INC,

 By: _____
_____ Officer of Authorized Agent

STATE OF: COMMONWEALTH OF PUERTO RICO

COUNTY OF: SAN JUAN

 BEFOR me a Notary Public in and for said County and State appeared
the officer/authorized agent to me known as the duly authorized agent of
_____ who acknowledged he/she did execute the foregoing
Agreement for Deed for and on behalf of said corporation and that the same
is its/and his/her free and deed.

 WITNESS my signature and official seal at _____ San Juan _____, in the

County of. _San Juan_____, and State of ___ Puerto Rico ___, this the __)__

day of _____, 19 75.

My Comission Expires ( )( # )36 ?

_____ / _____
 Permanent / NOTARY PUBLIC

This instrument prepared by:_____

**PURCHASE AGREEMENT**

# SUNRISE ACRES · · **01**
## (UNIMPROVED ACREAGE OFFERING

ARTICLES OF AGREEMENT, made this __19__ day of __June__, 19__70__, BETWEEN J. C. INVESTMENTS, INC., a corporation under the laws of the State of Florida, hereinafter referred to as the SELLER, and

NAME: __José A. Carrasquillo (Dr.)__

ADDRESS: __Aquamarina 2101, Reparto Bucaré__

CITY: __Río Piedras__ STATE: __Puerto Rico__

and hereinafter referred to as the PURCHASER.

WITNESSETH, That if the Purchaser shall first make the payments and perform the covenants hereinafter mentioned on Purchaser's part to be made and performed and abide by the terms and conditions of sale hereinafter mentioned, the Seller hereby covenants and agrees to convey and assure to Purchaser in fee simple, clear of all encumbrances whatever, by a good and sufficient deed, the tract of land situate in the County of Polk, State of Florida, known and described as follows, to wit:

### SEE ATTACHED PAGE

More or less, subject to accurate survey. Also, less reservations for right of way (as legally described), oil, gas and mineral rights and subject to other Restrictions of Record.

The Purchaser hereby covenants and agrees to pay the Seller as follows:

| | | |
|---|---|---|
| 1. Cash Price | | $ 8,995.00 |
| 2. Down Payment | | |
| a. Cash Down Payment | $ 900.00 | |
| b. Trade In | $ | |
| c. Total Down Payment | | $ 900.00 |
| 3. Unpaid Balance of Cash Price (1-2) | | $ 8,095.00 |
| 4. Other Charges: (If any) | | |
| | $ | |
| 5. Unpaid Balance (3 and 4) | | $ 8,095.00 |
| 6. Finance Charge: | | $ 2,690.60 |
| 7. Deferred Payment Price (1, 4 and 6) | | $ 10,785.60 |
| 8. Total of Payments | | $ 10,785.60 |
| 9. Annual Percentage Rate | | 6 % |

The total of payments shown herein (Item 8 above) is payable in __120__ monthly installments of $ __89.88__ each, commencing on __July 19, 1970__ and on the same day of each successive month thereafter until paid in full. Prepayment may be made at any time by the purchaser without penalty. The Seller retains title as a security interest in the above described real estate under the terms and conditions set forth in this Purchase Agreement. In case of failure of the purchaser to make the payments or any part thereof, or to perform any of the covenants on purchaser's part hereby made and entered into, this contract shall at the option of the seller, be forfeited and terminated, and the purchaser shall forfeit all payments made by purchaser on this contract.

Buyer hereby acknowledges that before he signed this Contract, he received and examined a copy of the appropriate property report, public offering statement, prospectus of public report required by Federal law and by the laws of Florida, as well as any property report or other appropriate documents required by the laws of __Puerto Rico__.

This Contract is subject to the Conditions of Sale printed on the reverse side and the statement below, which the Buyer has read. The Buyer agrees that no additional representations have been made to induce the purchase of the property and hereby acknowledges receipt of a copy of this Contract, the Truth-in-Lending Supplement, and 2 copies of the Notice to the Customer Required by Federal Law.

> Sunrise Acres is unimproved, unsurveyed acreage without physical access to each individual tract, without drainage or other improvements. Thirty-five (35%) percent is marsh or swampy and is subject to flooding.

IN WITNESS WHEREOF, the parties to these presents have hereunto set their hands and seals the day and year first above written.

WITNESS: J. C. INVESTMENTS, INC.

_Eugenio Robles_ BY: _____
 Officer or Authorized Agent

As to J. C. Investments, Inc. and Buyers _____ (SEAL)
 Buyer's Signature

 _____ (SEAL)
 Buyer's Signature

STATE OF:

COUNTY OF:

BEFORE me a Notary Public in and for said County and State appeared the officer/authorized agent to me known as the duly authorized agent of J. C. INVESTMENTS, INC., who acknowledged he/she did execute the foregoing Agreement for Deed for and on behalf of said corporation and that the same is its/and his/her free and deed.

WITNESS my signature and official seal at __San Juan__, in the County of __San Juan__ and State of __Commonwealth of Puerto Rico__, this the __30th__ day of __June__, 19__70__.

Affidavit #2849

My Commission Expires: _Permanent_

_Paul B. Smith_
NOTARY PUBLIC

This instrument prepared by: _____

## FURTHER TERMS AND CONDITIONS OF SALE

### Maintenance Charge:

Buyers and their assigns agree to pay an annual maintenance charge for the community facilities of $10.00 per year per lot, said charge to be billed, collected and administered by J. C. INVESTMENTS, INC.

### County Restrictions:

Buyers are bound by applicable Deeds of Restrictions and Deeds of Reservations recorded in the Public Records of Polk County, Florida.

### Access:

Legal access to each parcel in Sunrise Acres is provided by recorded easements and rights of way, however, no roadways to each parcel exist in Sunrise Acres and none are contemplated by either J. C. INVESTMENTS, INC., or the county government of Polk County.

### Exchange Privilege:

This tract may be exchanged for another available tract of the same classification of equal price (as determined by the then current sales price), or traded in at the full purchase price or the then current sales price (whichever is the higher) towards the purchase of another available higher priced tract at any time before Warranty Deed has been issued, or the Contract is recorded.

### Transfer of Interest:

This contract and the rights and interests hereunder are not transferable by Buyer without written consent of Seller and then only upon the same terms and conditions herein contained, provided the contract shall not be in default.

### Taxes:

All taxes on this property will be paid by Seller during the term of this Contract or until the recording of this Contract or until delivery by Seller of a Warranty Deed to Buyer, whichever first occurs. However, Buyer agrees to reimburse Seller for such taxes paid by Seller.

### No Personal Liability:

The stipulated purchase price shall under no circumstances be deemed or construed to be an obligation of Buyer for the payment of money enforceable by suit at law or in equity. In event of failure of Buyer to pay any installment when due, whether such failure be voluntary or involuntary, the only right of Seller arising thereunder shall be that of termination of this Contract and retention of all sums previously paid as liquidated damages.

### Default:

Buyer shall not be deemed in default under the terms of this Contract on account of failure, refusal or neglect to make any required deferred payment, unless and until a grace period which commences with the payment due date on the Contract has expired. The number of days grace differs according to the total cash paid into the contract, as follows:

 60 days grace if 10% or less of the principal amount of the purchase price has been paid.

 90 days grace if more than 10% but less than 25% of the principal amount of the purchase price has been paid.

 120 days grace if more than 25% but less than 50% of the principal amount of the purchase price has been paid.

 150 days grace if more than 50% of the principal amount of purchase price has been paid.

At least 14 days before the expiration of the grace period Seller shall have given the Buyer notice in writing by certified or registered mail of the amount due under the Contract and the exact expiration date of the grace period in the event of failure of Buyer to comply with this agreement any sum or sums of money therefore paid by Buyer hereunder shall be kept and retained by Seller as liquidated damages. The parties agree that said sum constitutes a reasonable amount of damages incurred by Seller.

### Forfeiture:

After Seller gives Buyer notice of forfeiture under the above paragraph, an affidavit by Seller or its agent showing such default and forfeiture and recorded in the County Recorder's office of Polk County, Florida, shall be conclusive proof, in favor of any subsequent bona fide purchaser or encumbrancer for value, of such default and forfeiture, and Buyer hereby irrevocably authorizes Seller or its agent to declare and record such default and forfeiture, and agrees to be bound by such declarations as his act and deed.

### Offering Statement:

If Buyer does not receive the property report as prescribed by the Office of Interstate Land Sales Registration, in advance of or at the time of his signing this contract, then he may void this Contract. If Buyer receives the property report as prescribed by the Office of Interstate Land Sales Registration less than forty-eight (48) hours before he signs this Contract, then Buyer may revoke this Contract within forty-eight (48) hours after signing it.

### 30 Day Refund Privilege:

Purchaser may, within 30 days hereafter, request a refund of all monies paid on this Contract.

### Restrictions:

This property shall not be used for a junk yard, dumping ground or for the accumulation of garbage or foul smelling matter or other nuisances which may be detrimental to the comfort, health and safety of the inhabitants of the surrounding community.

### Community Facilities:

Community facilities will be maintained until 1980 or conveyance of same to a Property Owner's Association, when and if such association may be established by the Seller.

LEGAL DESCRIPTION AS FOLLOWS:

Beginning at a point, 4071.38 ft., S 89° 14' W, and S 00° 50' 38" E, 50.0 from the Northeast corner of Section 1, T 26 S, R 25 E, Polk County, Flori said point being on the South Right of Way Line of State Highway No. S-54; run S 00°50' 38" E, 79.09 ft., to the Northeast corner of Waverly Growers Development, Unit 2, Block B; run thence S 89° 48' 15" W, 854.43 ft., to the Northwest corner of said Block B; run thence N 00°50' 38" W, 79.09 ft. to the South Right of Way Line of said Highway, said point being 1223.44 f East of the West Line of said Section 1; run thence N 89° 14' E, 854.68 ft to the Point of Beginning. Lot A-355.

 IN WITNESS WHEREOF, the parties to these presents have hereunto set their hands and seals that above legal description/descriptions are part of this Purchase Agreement.

WITNESS: J. C. INVESTMENTS, INC.

_____ By: _____
 Officer or Authorized Agent

_____

STATE OF:

COUNTY OF:

 BEFORE me a Notary Public in and for said County and State appeared the officer/authorized agent to me known as the duly authorized agent of J. C. INVESTMENTS, INC., who acknowledged he/she did execute the foregoin Agreement for Deed for and on behalf of said corporation and that the same is its/and his/her free and deed.

 WITNESS my signature and official seal at _San Juan_, in the County of _San Juan_, and State of _Commonwealth of Puerto Rico_, this the _30_ day of _June_, 19_70_.

_affidavit # 285 0_ _Paul B Smith_
My Commission Expires: NOTARY PUBLIC
_Permanent_ ABOGADO

 NOTARIO
This instrument prepared by.:_____

## APPENDIX D

# FLORIDA PUBLIC OFFERING STATEMENT

Filed by:

### J. C. INVESTMENTS, INC.

9700 WEST BAY HARBOR DRIVE

BAY HARBOR ISLANDS, FLORIDA

### FOR

# SUNRISE ACRES

2410 parcels of an average size of 1-1/4 acres each located in Township 26 South, Range 25 East, Polk County, Florida.

Not a part of a recorded subdivision, nor a part of a recorded plat. It is sold as a particular part of a Section, Township and Range.

Effective Date: July 1, 1970

THE PROPERTY DESCRIBED HEREIN IS NOT USABLE FOR BUILDING PURPOSES. IT IS UNDEVELOPED, UNIMPROVED, UNSURVEYED ACREAGE WITHOUT ROADS, DRAINAGE OR OTHER IMPROVEMENTS. THE SELLER IS NOT OBLIGATED TO PROVIDE ANY IMPROVEMENTS. 35% IS MARSH OR SWAMPY, IT IS LOCATED IN AN AREA KNOWN AS GREEN SWAMP AND IT IS SUBJECT TO FLOODING . $10.00 PER LOT PER YEAR WILL BE CHARGED FOR MAINTENANCE OF A LODGE AND OTHER COMMON FACILITIES.

THE COUNTY GOVERNMENT OF IMPERIAL POLK COUNTY, FLORIDA, HAS NOT PROMISED OR AGREED AND DOES NOT INTEND TO PROVIDE STREETS, DRAINAGE, WATER, UTILITIES OR ANY OTHER IMPROVEMENTS TO THIS LAND.

A 30-DAY UNCONDITIONAL REFUND PRIVILEGE AND AN EXCHANGE PRIVILEGE FOR THE LIFE OF THE CONTRACT IS GRANTED EACH PURCHASER. SELLER RETAINS TITLE AND POSSESSION UNTIL CONTRACT HAS BEEN PAID IN FULL.

"THIS PUBLIC OFFERING STATEMENT IS FOR INFORMATION PURPOSES ONLY. THE FLORIDA LAND SALES BOARD HAS NEITHER APPROVED NOR DISAPPROVED THE ACCURACY AND COMPLETENESS OF THIS STATEMENT."

## STATE PROPERTY REPORT DISCLAIMER

NOTICE AND DISCLAIMER BY OFFICE OF INTERSTATE LAND SALES REGISTRATION, U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT.

This report is not a recommendation or endorsement of the offerings herein by the Office of Interstate Land Sales Registration, nor has that Office made an inspection of the property nor passed upon the accuracy or adequacy of this report or any promotional or advertising materials used by the seller. Information contained herein has been filed with the State of Florida and the Office of Interstate Land Sales Registration.

It is in the interest of the buyer to inspect the lot and to read all contract documents before signing the contract to purchase or lease.

Prospective buyers and lessees are notified that unless they have received this property report prior to, or at the same time they enter into a contract, they may void the contract by notice to seller.

Unless a buyer or lessee acknowledges in writing that he has read the report and personally inspected the lot prior to signing his contract, he may revoke his contract within 48 hours from signing his contract if he has received the property report less than 48 hours prior to signing such contract.

Although a statement of record has been filed with the Office of Interstate Land Sales Registration, the filing has not been examined or verified.

## Part I

**Property:**

These properties are 3010.35 acres which have been subdivided into 2409, 1-1/4 acre investment parcels. They lie along State Road No. 33, the southern border being three miles North of Polk City, Florida.

**Encumbrances:**

These properties are encumbered by mortgages which have been placed of record. The mortgages contain release provisions or subordination clauses in favor of individual contract purchasers.

**Access:**

No physical access is implied or provided to any of the parcels described herein. Legal access has been provided to each parcel by recorded easements.

**Land Use:**

These properties are unimproved. Engineer's report on file with the Florida Land Sales Board indicates the property to have a minimum elevation of 120 feet above mean sea level. The Polk County engineer has described the lands as low and flat with approximately 35% marsh.

## PART II

**Area Facilities:**

The property fronts State Road No. 33 which leads to Polk City, three miles away, and other highway connections to cities and towns located within 25 miles of the property which would provide shopping, schools, hospitals, churches and recreation within a 25 mile radius of the property.

**Improvements:**

No improvements exist on the property and none are contemplated or promised by the owner. A house presently in "Sunrise Acres" and a road leading to it will be maintained for the use of purchasers until 1980 or conveyance to the Property Owner's Association.

**Public Utilities:**

Electricity, Gas and Telephone service presently unavailable within the boundaries of the property, would only be available when demand warranted same.

**Public Transportation:**

Public transportation connections can be made to within 25 miles of the property and transportation thereafter would be by private automobile or hired vehicle.

**Common Facilities:**

A house presently in "Sunrise Acres" and the road leading to it will be converted to and maintained as a lodge and recreation center for purchasers by the Developer. $10.00 per lot per year will be paid by each purchaser to defray the expense of maintaining these facilities.

**Present Development and Occupancy:**

There are two homes in Sunrise Acres, one of which will be used as a lodge for the convenience and recreation of visiting property owners.

**Governmental Control:**

The taxation, assessment, and zoning of Sunrise Acres is within the authority of the County Commission of Polk County. County seat is Bartow, Florida.

**1082**

### Part III

**Method of Sale:**

Sales will be made by Contract for Deed, the normal terms of which will include 10% down, 1% per month until paid in full. Title and possession will be retained by Seller until the contract has been paid. The contracts will normally provide an interest rate of 7%. A maintenance fee of $10.00 per lot per year will be charged each buyer until 1980. Thereafter, a Property Owner's Association is proposed for maintaining the common facilities and assessing the pro-rata expense thereof.

**Type of Sales Program:** ·

Sales will be made by authorized representatives and brokers in jurisdictions where the offering of these parcels is permitted. In addition to personal contact with purchasers, mail and telephone sales may be made.

**Additional Information: None.**

### NOTICE TO PURCHASERS

THE PURCHASER SHOULD ASCERTAIN FOR HIMSELF THAT THE PROPERTY OFFERED MEETS HIS PERSONAL REQUIREMENTS AND EXPECTATIONS. MISUNDERSTANDINGS AS TO THE DESIRABILITY OF THE PROPERTY MAY ARISE WHEN THE PURCHASER FAILS TO UNDERSTAND THE NATURE OF THE PROPERTY OFFERED OR THE TERMS OF THE CONTRACT.

### BE SURE AND READ YOUR CONTRACT BEFORE YOU SIGN

THE SUBDIVIDER IS REQUIRED TO GIVE YOU AN OPPORTUNITY TO READ THIS OFFERING STATEMENT BEFORE YOU ENTER INTO A PURCHASE AGREEMENT.

### DO NOT SIGN UNLESS YOU HAVE READ THE OFFERING STATEMENT

THE PROPERTY DESCRIBED HEREIN IS NOT USABLE FOR BUILDING PURPOSES. IT IS UNDEVELOPED, UNIMPROVED, UNSURVEYED ACREAGE WITHOUT ROADS, DRAINAGE OR OTHER IMPROVEMENTS. THE SELLER IS NOT OBLIGATED TO PROVIDE ANY IMPROVEMENTS. 35% IS MARSH OR SWAMPY, IT IS LOCATED IN AN AREA KNOWN AS GREEN SWAMP AND IT IS SUBJECT TO FLOODING. $10.00 PER LOT PER YEAR WILL BE CHARGED FOR MAINTENANCE OF A LODGE AND OTHER COMMON FACILITIES.

THE COUNTY GOVERNMENT OF IMPERIAL POLK COUNTY, FLORIDA, HAS NOT PROMISED OR AGREED AND DOES NOT INTEND TO PROVIDE STREETS, DRAINAGE, WATER, UTILITIES OR ANY OTHER IMPROVEMENTS TO THIS LAND.

A 30-DAY UNCONDITIONAL REFUND PRIVILEGE AND AN EXCHANGE PRIVILEGE FOR THE LIFE OF THE CONTRACT IS GRANTED EACH PURCHASER. SELLER RETAINS TITLE AND POSSESSION UNTIL CONTRACT HAS BEEN PAID IN FULL.

Receipt of Florida Offering Statement

DECLARACIONES DE OFRECIMIENTO PUBLICO

- EN LA FLORIDA -

Archivada por:

**J. C. INVESTMENTS, INC.**
P. O. BOX 267
Polk City, Florida 33868

Para

**SUNRISE ACRES**

2410 parcelas sin desarrollar de un tamaño promedio de 1 1/4 acres cada una, localizadas en el (Township) 26 Sur, (Ringlera) 25 Este, Condado de Polk, Florida.

No parte de una subdivisión inscrita, ni parte de un terreno inscrito señalado a un uso particular. Se vende como una parte de (Sección, Township y Ringlera).

Fecha Efectiva: Julio 1, 1970
Revisado Octubre 28, 1971.

LA TIERRA AQUI DESCRITA ESTA SIN DESARROLLAR, DESLINDAR, SIN CALLES, ALCANTA-RILLADO NI OTRAS MEJORAS. NO SE PUEDE UTILIZAR PARA FINES DE EDIFICACION HASTA TANTO SE HAGAN LAS MEJORAS DE ACUERDO CON LAS REGULACIONES DEL CONDADO DE POLK. NI EL VENDEDOR NI EL GOBIERNO DEL CONDADO DE POLK HAN PROMETIDO, ACOR-DADO O PRETENDIDO HACER CALLES, SANEAMIENTO, ALCANTARILLADO NI PROVEER AGUA NI OTRAS MEJORAS A ESTAS TIERRAS. EL 35% ES BAJO, SUCEPTIBLE A ANEGARSE EN EPOCAS DE FUERTES LLUVIAS. SE COBRARA $10.00 AL AÑO POR LOTE PARA MANTENI-MIENTO DE UNA CASA CLUB Y OTRAS FACILIDADES. EL VENDEDOR RETENDRA EL DOMINIO Y LA POSESION HASTA QUE EL CONTRATO HAYA SIDO PAGADO TOTALMENTE.

ESTE REPORTE DE LA PROPIEDAD ES SOLAMENTE PARA FINES DE INFORMACION. EL FLORIDA LAND SALES BOARD NO HA APROBADO NI DESAPROBADO LA EXACTITUD Y TO-TALIDAD DE ESTA DECLARACION. NOTIFICACION Y RENUNCIA POR PARTE DE LA OFICINA DE VENTAS DE TERRENOS INTERESTATALES. DEPARTAMENTO REGISTRO DE VIVIENDAS Y DESARROLLO URBANO DE LOS ESTADOS UNIDOS DE AMERICA.

Este reporte no constituye una recomendación o un endoso de los ofrecimientos en ésta por parte de la Oficina de Registros de Ventas de Terrenos Interestatales, tampoco ha hecho esta oficina una ins-pección de la propiedad ni ha fallado sobre la exactitud o lo adecuado en este reporte o ninguno de los materiales de promoción o propaganda usados por el vendedor. La información contenida en ésta ha sido archivada con el Estado de la Florida y la Oficina de Registro de Ventas de Terrenos Inter-estatales.

Es en interés del comprador inspeccionar el lote y leer todos los documentos de contrato antes de firmar el contrato de venta o de arrendamiento. Los compradores y arrendatarios futuros son notifi-cados que a no ser que hayan recibido este reporte de propiedad antes que, o al mismo tiempo que ellos entren en contrato, ellos pueden abolir el contrato notificando la compañía vendedora.

A no ser que el Comprador o el arrendatario declare por escrito que él ha leído el reporte y personal-mente inspeccionado el lote antes de firmar su contrato, él puede revocar este contrato 48 horas después de firmarlo si él ha recibido el reporte de la propiedad menos de 48 horas antes de firmar dicho contrato.

Aunque una declaración de inscripción se ha archivado en la oficina de Registro de Ventas de Terre-nos Interestatales, este archivo no se ha examinado o verificado.

PARTE I

Propiedad:

Esta propiedad es de 3010.35 acres que han sido subdivididos en 2410 parcelas de 1 1/4 acre Están localizadas a lo largo de la Carretera Estatal Número 33, la colindancia del Sur es-tando tres millas al norte de la ciudad de Polk, en la Florida.

THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U. S. DEPART-MENT OF HOUSING AND URBAN DEVELOPMENT HAS ACCEPTED THIS FLORIDA PUBLIC OFFERING STATEMENT, AS THE PROPERTY REPORT ON THIS SUBDIVISION

**Gravamen:**

Estas propiedades tienen hipotecas que han sido registradas. Estas hipotecas contienen provisiones de cesión o cláusulas de subordinación en favor de los compradores de contrato individual.

**Acceso:**

Ningún acceso físico es implicado o provisto de ninguna de las parcelas aquí descritas. Acceso legal se ha provisto a cada parcela por derecho incorpóreo.

**Uso de la Tierra:**

Esta propiedad está sin desarrollar y no puede ser considerada con propósito de construcción sin habérsele hecho la construcción de caminos y drenajes, lo cual no es prometido por el vendedor. Esta propiedad no está segregada individualmente. Están descritas como parte de Sección Township y Ringlera.

La zonificación de la propiedad actualmente es agrícola. Toda la zona geográfica dentro del Condado de Polk donde se encuentra esta propiedad se conoce como Green Swamp. El reporte del Ingeniero archivado con la Junta de Ventas de tierra de la Florida, indica que la propiedad tiene una elevación mínima de ciento veinte pies sobre el nivel del mar, siendo estas descritas tierras llanas bajas, con un 35% aproximadamente anegables en épocas de fuertes lluvias.

La protección policíaca está provista por el Sheriff del Condado de Polk con dos diputados en Polk City a tres millas. El servicio de bomberos es provisto por bomberos voluntarios en la ciudad de Polk. No hay acceso físico a las parcelas individuales.

## PARTE II

**Facilidades o Ventajas del Area:**

La propiedad colinda al frente con la Carretera Estatal Número 33 que conduce a Polk City a 3 millas y otras carreteras con connecciones a ciudades y pueblos localizados dentro de 25 millas de la propiedad que proveerían comercios, escuelas, hospitales, iglesias y recreación en un radio de 25 millas de la propiedad.

**Mejoras:**

Calles no prometidas por no ser una sub-división residencial.
Agua no prometida por no ser una sub-división residencial.
Alcantarillados no prometidos por no ser una sub-división residencial.
Drenaje no prometido por no ser una sub-división residencial.
Segregación individual: Las parcelas individuales no están segregadas, sinembargo la segregación individual puede ser obtenida por un agrimensor local con un costo estimado de $150.00. No existen mejoras ni son contempladas en promesa por el vendedor.
Se mantendrá un lodge en la propiedad con accesibilidad por carretera y se mantendrá hasta el año 1980 para el uso de los clientes mientras visiten la propiedad.

**Utilidades Públicas:**

Servicio de electricidad y teléfono están existentes hasta el lodge dentro de la propiedad. Sinembargo este servicio no está extendido hasta las parcelas individuales.
Gas embotellado está disponible por los suplidores locales en Lakeland.

**Transporte Público:**

Conexiones de transporte públicos a la propiedad se pueden hacer dentro de 25 millas de la propiedad y el transporte desde ahí tendrá que ser por automóvil privado o por vehículos alquilados.

**Facilidades o Ventajas Comunes:**

La casa que se encuentra actualmente en la propiedad y la carretera que va hacia ella serán mantenidas y conservadas como un centro de recreo para los compradores. Se pagarán $10.00 anuales por parte de cada comprador para aliviar los costos de mantenimiento de estas facilidades.

**Desarrollo y Ocupacion Presente:**

Hay una casa en Sunrise Acres que será usada como casa club para la conveniencia y recreación de los dueños visitantes de la propiedad.

**Control Gubernamental:**

Impuestos y zonificación de Sunrise Acres están bajo la autoridad de la Comisión del Condado de Polk. El asiento del Condado está en Bartow, Florida.

Método de Venta:

7% de Interés. La tarifa de mantenimiento de $10.00 anuales por parcela, por año, será cobrada hasta el año 1980. Se le ofrece la garantía privilegiada de devolución sin condiciones por un período de treinta días y un privilegio de cambio durante la vigencia del contrato por el principal de los pagos hechos por el cliente.

Las ventas se harán por Contrato de Venta, cuyos términos normales incluyen 10% de pronto, 1% por mes hasta que sea pagado totalmente. El título de propiedad permanecerá en las manos del Comprador hasta que el contrato sea pagado.

**Diferentes Clases de Programas de Ventas:**

Las ventas se harán por representantes autorizados y corredores en jurisdicción donde el ofrecimiento de estas parcelas sean permitidos. Además de contactos personales con los compradores, se pueden hacer ventas por correspondencia y ventas telefónicas.

Información Adicional:

### NOTIFICACION A LOS COMPRADORES

EL COMPRADOR DEBE CERCIORARSE QUE LA PROPIEDAD OFRECIDA SE ENCUENTRA CON LAS EXPECTACIONES Y REQUERIMIENTOS PERSONALES DEL COMPRADOR. MALOS ENTENDIDOS SOBRE LA PROPIEDAD PUEDEN OCURRIR CUANDO EL COMPRADOR NO ENTIENDE LA NATURALEZA DE LA PROPIEDAD OFRECIDA O LOS TERMINOS DEL CONTRATO.

### ASEGURESE LEER SU CONTRATO ANTES DE FIRMARLO

LA PERSONA QUE HACE LA SUBDIVISION DEBE DARLE LA OPORTUNIDAD DE LEER ESTA DECLARACION DE OFRECIMIENTO ANTES DE QUE USTED ENTRE EN UN ACUERDO DE COMPRA.

### NO FIRME HASTA QUE UD. HAYA LEIDO LA DECLARACION DE OFRECIMIENTO

LA TIERRA AQUI DESCRITA ESTA SIN DESARROLLAR, DESLINDAR, SIN CALLES, ALCANTARILLADO NI OTRAS MEJORAS. NO SE PUEDE UTILIZAR PARA FINES DE EDIFICACION HASTA TANTO SE HAGAN LAS MEJORAS DE ACUERDO CON LAS REGULACIONES DEL CONDADO DE POLK. NI EL VENDEDOR NI EL GOBIERNO DEL CONDADO DE POLK HAN PROMETIDO, ACORDADO O PRETENDIDO HACER CALLES, SANEAMIENTO, ALCANTARILLADO NI PROVEER AGUA NI OTRAS MEJORAS A ESTAS TIERRAS. EL 35% ES BAJO, SUCEPTIBLE A ANEGARSE EN EPOCAS DE FUERTES LLUVIAS, SE COBRARA $10.00 AL AÑO POR LOTE PARA MANTENIMIENTO DE UNA CASA CLUB Y OTRAS FACILIDADES. EL VENDEDOR RETENDRA EL DOMINIO Y LA POSESION HASTA QUE EL CONTRATO HAYA SIDO PAGADO TOTALMENTE.